JAMES G. BARSALOUX *et al.* Appellants, *vs.* THE CITY OF CHICAGO *et al.* Appellees.

*Opinion filed June 29, 1910—Rehearing denied October 6, 1910.*

1. MUNICIPAL CORPORATIONS—*city has power to construct or acquire underground street railways.* The words "street railways," used in section 1 of the Mueller law of 1903, giving cities power to own, construct, acquire, purchase, maintain, operate and lease street railways within their corporate limits, include not only street railways on the surface of streets but also those above or beneath the surface.

2. SAME—*city has power to construct street railway subways.* Under the Mueller law of 1903 a city has power to construct subways for street railways and to lease the same to the street railway companies, and the fact that a street railway company is to contribute a certain amount to the cost of the subways as consideration for their use does not change the relation of the city and the company from lessor and lessee to that of partners.

3. SAME—*granting exclusive use of subways to certain street railway not unlawful.* The fact that a city grants to a street railway company, as its lessee of a subway, the exclusive use of the tracks in such subway for the remainder of the term under which the company is operating, does not amount to an exclusion of the public from the street and is not unlawful.

4. SAME—*city has power to do preliminary work in connection with constructing subways.* Having power, under the Mueller law of 1903, to construct or acquire underground street railways, a city has the power to construct or acquire the subways for such underground street railways, and to take such preliminary steps and do such preliminary work as are necessary in order to determine whether it is advisable to proceed with the construction of such subways.

5. SAME—*the city of Chicago may use "traction fund," or any other available fund, in exercising its power to construct subways.* In exercising its power to construct the street railway subways contemplated in the "traction ordinances of 1907," the city of Chicago may expend for such purpose the "traction fund" or any other available funds of the city not otherwise appropriated, but the traction fund cannot be used for general corporate purposes.

APPEAL from the Circuit Court of Cook county; the Hon. GEORGE A. CARPENTER, Judge, presiding.

JAMES H. WILKERSON, for appellant James G. Barsaloux.

HENRY M. ASHTON, DAVID K. TONE, DONALD R. RICHBERG, and ROY D. KEEHN, (JAMES H. WILKERSON, of counsel,) for appellant the Illinois Publishing and Printing Company.

WALTER L. FISHER, (EDWARD J. BRUNDAGE, Corporation Counsel, of counsel,) for appellees.

Mr. CHIEF JUSTICE VICKERS delivered the opinion of the court:

James G. Barsaloux, a citizen and tax-payer of the city of Chicago, filed two bills in the circuit court of Cook county against the city of Chicago, Walter H. Wilson and Isaac N. Powell, who were, respectively, comptroller and treasurer of the city of Chicago, for the purpose of obtaining a decree adjudging separate paragraphs in the general appropriation ordinance of March 8, 1909, unconstitutional and invalid, and for an injunction against the city of Chi-

cago, its officers, agents and employees, restraining them from taking any further steps and from incurring any further expense in connection with preliminary subway work in accordance with the terms and provisions of certain ordinances passed February 11, 1907, which are known as the "traction ordinances" of the said city. In one of the bills (No. 7070) said Barsaloux was the sole complainant, and in the other (No. 7077) the Illinois Publishing and Printing Company was a co-complainant. The bills specifically pray for an injunction against the payment of certain warrants which have been issued, payable out of the money which is appropriated by the paragraphs of the appropriation ordinance the validity of which is attacked by the bills. The defendants below interposed general demurrers to each of said bills, which were sustained by the court. The trial judge having certified that the validity of a municipal ordinance was involved and that in his opinion the public interest required that the case should be passed on by this court, direct appeals from decrees dismissing each of the bills have been perfected to this court. The controlling questions in the two cases being the same, they have been consolidated by an order of this court and will be considered together.

In the bill filed in No. 7077 it is alleged that on March 8, 1909, the appropriation ordinance for the fiscal year commencing January 1, 1909, was duly passed by the city council of Chicago; that among the items in said appropriation ordinance was the following appropriation for the committee on local transportation: "For conducting an investigation into and securing a report of expert engineers and others as to the desirability of constructing subways under and in accordance with the provisions of the ordinances of the city of Chicago passed February 11, 1907, and entitled 'An ordinance authorizing the Chicago City Railway Company to construct, maintain and operate a system of street railways in streets and public ways of the

city of Chicago,' and 'An ordinance authorizing the Chicago Railways Company to construct, maintain and operate a system of street railways in streets and public ways of the city of Chicago,' and as to the location, character, construction and use of said subways, and for preparing plans therefor, $50,000, said amount to be paid out of the moneys paid to the city of Chicago by said above named companies in pursuance of said ordinances of February 11, 1907." In No. 7070 it is alleged that in the same appropriation ordinance the following appropriation was made for the committee on local transportation: "Salary of secretary and expenses for the employment of such legal, engineering and other expert assistants on elevated railroads and street railroads and subways as may be necessary, and for expenses thereof, and for printing, postage and supplies, $25,000." The bills allege that on March 22, 1909, the city council of Chicago passed an ordinance levying the taxes for that year, which contained provisions identical with those in the appropriation ordinance above quoted.

It will be observed that the $50,000 item in the appropriation ordinance is payable out of the moneys paid to the city of Chicago by the traction companies in pursuance of the ordinances of February 11, 1907, while the $25,000 item is payable out of any funds available for general corporate purposes, and this difference is, no doubt, the reason for filing two bills instead of one. The authority under which the city council assumed to make these appropriations and the general purpose in furtherance of which they were made are identical. It is conceded by counsel in their briefs, which are, in substance, the same in both cases, that the primary question to be decided is whether the city of Chicago has the power to acquire by purchase, or to construct, a system of subways for street railways under the public streets of the city, and to expend either the special traction fund or the general corporate funds of the city for such purpose. Since both items of the appropriation ordi-

nance relate to preliminary work for the purpose of determining the advisability of constructing a system of subways in accordance with the provisions of the ordinances of February 11, 1907, which are known as the "traction ordinances," it will be necessary to state in a general way the general features of the traction ordinances which have a bearing upon the questions involved.

Section 1 of the ordinance grants to the Chicago City Railway Company, its lessees, successors and assigns, the right to construct, re-construct, maintain and operate a system of street railways upon the public streets of the city of Chicago as the same are set out in a schedule attached to said ordinance. Section 6 relates to subways, and provides for the construction, at the joint expense of the Chicago City Railway Company, the Chicago Railways Company and the city, of a system of subways for the joint use of the said companies as down-town terminals of their street railway systems and for the use of said city and its licensees. The legal title to said subways is to be in the city, subject to the rights of the companies under the ordinance. It is provided that the total amount which the companies may be required to contribute toward the construction of said subways shall not exceed $5,000,000, exclusive of the cost of re-constructing and converting the tunnels under the Chicago river into a part of said system of subways. Two-fifths of the part to be paid by the companies is to be contributed by the Chicago City Railway Company, three-fifths by the Chicago Railways Company and the balance by the city of Chicago. The ordinance provides that the companies shall not be obligated to join in defraying the cost of the construction of such subway system until the city shall authorize the construction of such subway system by an ordinance and the location, character and extent of the plans and specifications for such subway system have been approved by the board of supervising engineers. In addition to the $5,000,000 which the companies may

be required to contribute for the down-town terminal subways, it is also provided in the ordinance that the city may require a *pro rata* contribution from the said companies for the construction of extensions and additions to such subway system as may be provided for by ordinance and approved by the board of supervising engineers. The ordinance further provides that the two street railway companies shall have the exclusive right to occupy and use the railway tracks in said subways during the existence of the grant, subject to the right of the city to lease any surplus capacity in the subways to other street railway companies, and to apportion the rents received between the railway companies and the city on the same basis that the net receipts of the railway companies are to be divided between the companies and the city. The ordinance provides that the city shall have the right to purchase said street railway system, and all of the property and franchises belonging thereto, during the existence of the grant, for the sum of $21,000,000, plus the value of extensions and improvements subsequently made, and fixes a method of determining the value of such extensions and improvements. Section 24 of the ordinance provides that after making certain deductions therefrom, the gross receipts from the operation of the two street railway systems shall be divided between the city and the companies on the basis of fifty-five per cent to the city and forty-five per cent to the companies. The ordinance provides that, subject to the action of the city council, the city shall deposit its portion of the net earnings of the street railway companies to the credit of the city in a separate fund, to be kept and used for the purchase and construction of street railways by said city. It is provided, however, that any failure on the part of the city to comply with this last provision of the ordinance shall in no way affect the rights or obligations of the companies under the ordinance.

There are many other minor provisions of the ordinance intended to safeguard the rights of all parties concerned, but we do not deem it necessary to a proper understanding of the questions here involved to set them out. The ordinance was formally accepted by the street railway companies, and the general public policy embodied in said ordinance was approved by a majority of the voters of Chicago at an election held in April, 1907.

It is averred in the bills, and, of course, admitted by the demurrers, that the railway companies have paid into the city treasury of Chicago about $2,000,000 since the ordinance was adopted, all of which remains under the control of the city treasurer, who has placed it to the credit of a fund separate and apart from the other funds of the city. The committee on local transportation mentioned in the appropriation ordinance is a committee provided for by the rules of the city council, to which are referred all matters coming before the council that in any way concern transportation upon the public streets of the city. Under the direction of the committee on transportation, investigations into the desirability of constructing subways have been made, and reports of expert engineers and others in reference to such subways have been procured, and it is to pay the expenses thus incurred that the appropriations in question were made. Expenses aggregating substantially the whole amount of $50,000 have been incurred and orders have been drawn for the same, payable out of the special traction fund above referred to. It is charged in the bills that the city of Chicago is entirely without power or authority to either build or authorize the building of subways such as are described in the said ordinances or to grant authority to any other corporation to so build such subways, and that the appropriation and payment of any public funds, either from the special traction fund or the general corporate funds of the city, for preliminary work in connection with such subways is illegal and a misap-

propriation of public funds, which may be enjoined at the suit of an interested tax-payer.

The first question presented for consideration upon the conceded facts as above stated is that relating to the power of the city of Chicago to expend money out of any corporate funds for work in connection with the construction of a system of subways in accordance with the provisions of the street railway ordinances above mentioned. If it be determined that the city under no circumstances has the power to construct underground street railways no other question need be considered. If, however, it is found that the city, under proper conditions, may build subways, then a further question will arise whether the city possesses the power to build such a system of subways as is provided for in the traction ordinances of February 11, 1907. If the city has the power to build subways in accordance with the plan embodied in the traction ordinances, it will be necessary to determine the further question what funds may be used by the city for such purpose.

Section 1 of the act of 1903, known as the Mueller law, provides as follows: "That every city of this State shall have the power to own, construct, acquire, purchase, maintain and operate street railways within its corporate limits, and to lease the same or any part of the same to any company incorporated under the laws of this State for the purpose of operating street railways for any period not longer than twenty years, on such terms and conditions as the city council shall deem for the best interest of the public." (Hurd's Stat. 1908, chap. 24, p. 459.) The language of the above statute is clear and unambiguous, and the only question that can arise is whether the term "street railways" may be held to include underground street railways.

In the case of *Doane* v. *Lake Street Elevated Railroad Co.* 165 Ill. 510, it was held that the use of public streets for elevated railroads, when authorized by the municipality, was not subjecting the streets to an unlawful use, and

that there was no distinction between the use of streets
for elevated railroads in this regard and surface roads.    In
*Bond* v. *Pennsylvania Co.* 171 Ill. 508, in distinguishing
the *Doane case* from the case then in hand, this court, on
page. 517, said: "But in that case [*Doane case*] it was
pointed out that there was no distinction between surface
and elevated street railways, and the roads there in ques-
tion were regarded as street railways, constructed and op-
erated for the public convenience in facilitating travel along
such streets."

Street railways may be constructed under municipal
authority either on the surface of the streets or at an ele-
vation above the streets.    The case of *Knopf* v. *Lake Street
Elevated Railroad Co.* 197 Ill. 212, does not hold a contrary
doctrine.    In that case the court had before it an elevated
railroad company organized under the general Railroad law
of 1872 for the incorporation of railroads, and the ques-
tion presented was whether such railroad was subject to
taxation by the local authorities or by the State Board of
Equalization.    This court held that the power of taxation
belonged to the State board and not to the local authorities,
and that such railroads were not street railways within the
meaning of the Revenue law.    There is no departure in
this case from the rules laid down in the *Doane* and *Bond
cases, supra.*

In the case of *Lieberman* v. *Chicago Rapid Transit
Railroad Co.* 141 Ill. 140, one of the questions presented
was whether a railroad company incorporated under the
general Railroad law had the power to construct an ele-
vated railroad in one of the public streets of Chicago, and
in disposing of that question this court, on page 146, said:
"It is contended, therefore, first, that said articles, by their
terms, apply only to a surface railroad; and secondly, that
the statute under which the incorporation was formed con-
templates the organization of railroad companies only for
the construction of ordinary surface railroads.    To this

view we are unable to assent. The first section of the act authorizes the organization of corporations 'for the purpose of constructing and operating any railroad in this State,' and said articles of incorporation provide for the construction of a 'railroad' between two specified termini. We are able to perceive no reason why the word 'railroad,' as here used, should not be construed to apply to elevated railroads as well as to any others. While most railroads, for obvious reasons, are so constructed as to make their grade conform, as nearly as practicable, to that of the earth's surface, yet it is a fact with which everyone is familiar that they are sometimes constructed wholly beneath the surface and sometimes upon an elevation above the surface. It is also a matter of common knowledge that an ordinary surface railroad may, and often does, in different parts of its line, run through tunnels excavated beneath the surface or upon structures so built as to elevate it above the surface, but it has never been supposed that where they run beneath or above the surface they are any the less entitled to the name of railroads. Nor does the fact that a railroad is wholly underground or wholly raised above the surface make it any the less a railroad."

Under these authorities the words "street railways," used in the first section of the Mueller law, must be held to include street railways built either on the surface of streets or elevated above them. If the public interest should require that all or a portion of the street railways of a city should be constructed beneath the surface of the streets, no valid reason is perceived why the power to meet such public necessity should be denied in respect to such subways that does not apply with equal force to surface and elevated street railways. Street railways, whether constructed above, below or on the surface of the streets, are intended to furnish the public with a convenient means of traveling from one part of a city to another. The primary use of streets is to accommodate travel in cities and towns, and

since street railways afford the public increased facilities for street travel, the use of streets for this mode of travel does not impose any additional servitude on such highways.

In *In re New York District Railway Co.* 14 N. E. Rep. 187, the Court of Appeals of New York had under consideration the validity of, and rights conferred on the railway company by, an act of the legislature under which the company proposed to construct and operate an underground railway. It was conceded by the company that if the act in question authorized the construction and operation of a street railway it was unconstitutional, and it was contended that the railway the act authorized the construction and operation of was not a street railway. In discussing the proposition the court said, on page 189: "When the work is all done the street will consist of two stories or surfaces,—one carrying the ordinary traffic and movement, lessened by so much as is diverted to the swifter transit of the other, and both together will do what one alone did to the extent of its capacity. Such a road is to be deemed a street railway, not only because it subserves street purposes and reaps the benefit of street easements and occupies and modifies the street surface, but also because it is fully within the mischiefs which the constitutional provision was designed to redress and prevent. * * * The same reasons which dictated a constitutional protection against roads on or above the surface of the streets apply to those which are built beneath in the manner here contemplated, and these should justly be deemed street railroads, within the meaning of that phrase as used in the constitution."

The reasoning of the New York court in the case above quoted from is applicable to the case at bar. It is not at all improbable that in a great city like Chicago, in order to have a complete system of street railways, it will become necessary to construct street railways upon, above and below the surface of the streets. The Mueller law, as well

as the traction ordinances, contemplates the acquisition of
street railways by purchase or construction.   It would be
unreasonable to hold that the city could purchase such part
of a street railway system as was built upon the surface of
the streets, but could not acquire such portions, if any, of
the system as were below the surface of the streets.   So
far as the power of the city to acquire or construct street
railways is concerned, in our opinion there is no difference
between surface street railways and those constructed be-
neath the streets.

Having reached the conclusion that the city of Chicago
has the power to acquire or build subways, it becomes nec-
essary to consider whether the preliminary work which it
is proposed to pay for out of the appropriations in question
is an unlawful exercise of the powers granted.   It will be
remembered that if any subways are constructed under the
traction ordinances the legal title to such subways will be
vested in the city of Chicago.   The ordinances provide that
the traction companies shall contribute to the cost of such
subways to an amount not exceeding $5,000,000.   Such
contribution to the cost will not create a partnership or
joint ownership in the subways.   The traction companies
will have the privilege of using the subways during the re-
mainder of their terms in accordance with the ordinances
under which they are now operating, unless the city should
sooner elect to exercise its right to take over, by purchase,
the street railway systems of the city.   The relation of the
city and the traction companies, in so far as the subways
are concerned, would be that of lessor and lessee.

It is seriously contended that the exclusive use of the
subways by the traction companies under the ordinances is
unlawful.   The argument is, that the ordinances grant an
exclusive right to the traction companies to use the sub-
ways.   No one would seriously contend that a city had the
right to grant the exclusive use of its streets to a street
railway company, and thus compel all persons who use the

245—39

streets to travel upon the street cars of such company. No such unlimited grant is contemplated by the traction ordinances. The clear meaning of the ordinances is that the city will not permit any other street car company to use the tracks in the subway that are leased to the present traction companies. We have no doubt that if the city owned a surface street railway it would have the right to lease such track and give the lessee the exclusive right of operating street cars upon such street car track, but the rights of the public in the street would be the same as they are where the street car company owns its own track. Street railway companies have the right to exclude other street railway companies from the use of their tracks, and this right has never been supposed to render their use of the streets unlawful. In *Sun Printing and Publishing Ass'n v. Mayer,* 152 N. Y. 257, (46 N. E. Rep. 499,) the Court of Appeals of New York held that the building of a subway for the operation of a street railway was a city purpose within the meaning of the constitution of New York, which prohibits the city from incurring indebtedness for any purpose other than city purposes. In that case the power of the city to lease such subway for a period of from thirty-five to fifty years, with the privilege of renewals, was involved. In disposing of that question the court said: "The provisions for a lease are not objectionable. They are rather in accord with our American form of government, which leaves trade and commerce to be carried on by individual industry and enterprise. The government has annually expended large sums in the construction of highways, in digging canals, in building harbors and in the improving of tunnels and rivers for the purpose of aiding and promoting trade and commerce, yet its policy hitherto has been to leave the conduct of such business to individual enterprise. The city of New York is the owner of ferry rights, together with docks and piers which it has constructed upon its rivers. These docks and piers afford ac-

cess to its water highway. These, with its ferry rights, it leases, from time to time, for specified terms. In that way it furnishes highways in which its inhabitants may engage in the transportation of persons and property, thus promoting the commerce of the city. Nothing more is authorized to be done with reference to the leasing of the proposed railroad. It would be used for the same purpose and promote and facilitate the travel of persons and the commerce of the city." The power to lease street railways is expressly conferred by section 1 of the Mueller law above quoted. There is nothing in the traction ordinances relating to the exercise of the power to lease street railways that renders such ordinances invalid.

The only remaining question requiring consideration is whether the city may use the special traction fund for the purpose of acquiring or constructing subways. Section 24 of the traction ordinance provides that the city shall deposit fifty-five per cent of the net earnings of the traction companies to the credit of a separate fund, to be kept and used for the purchase and construction of street railways by said city. Under this ordinance clearly the city would have no power to divert this fund to general corporate purposes, but using it to construct subways is not a diversion of such fund. The construction of subways is the construction of street railways, and is therefore the identical purpose for which such fund may be used. The city is not, however, limited to the use of this fund, alone, for such purpose. Any available funds, not otherwise appropriated, in the city treasury may properly be applied to the construction or purchase of subways. There is nothing in the case of *Lobdell* v. *City of Chicago,* 227 Ill. 218, which holds to the contrary. In that case the only question involved was whether the issue of certificates under the Mueller law created an indebtedness against the city, and it was determined that such certificates were evidence of municipal indebtedness, and that since the city of Chicago was

already indebted to the constitutional limit the issue of such certificates was illegal. It was not intimated in that case that the city might not acquire street railways if the money for that purpose was in the city treasury. There is, in our opinion, no valid objection to using the traction fund, or any other available corporate funds, for the purpose of acquiring or constructing subways in the streets of the city. The appropriations made by the city are not for the purpose of purchasing or constructing subways, but only for the purpose of doing necessary preliminary, work which will enable the city to determine whether it is advisable to proceed with the construction of such subways under the existing ordinances of the city. The traction companies cannot be compelled to contribute to the cost of such subways until an ordinance is passed by the city council describing in detail the character of subways to be constructed and the plans and specifications are approved by the board of supervising engineers. The power to construct necessarily includes the power to take the preliminary steps contemplated by the appropriation ordinance in question.

The questions involved in these cases are of great importance. We have given their consideration that careful study and serious reflection which their far-reaching consequences seem to require. Our conclusion is that the city has the power to acquire or construct street railways, and that "street railways," properly construed, mean elevated, surface or underground railways; that the city of Chicago may exercise this power in accordance with the traction ordinances of 1907, and may expend for such purpose either the special traction fund or any other available corporate funds belonging to the city.

It follows from what has been said that the court below properly sustained the general demurrers to appellants' bills, and the decrees will therefore be affirmed.

*Decrees affirmed.*