Benjamin Baltzer, Appellant, v. City of Chicago et al., Appellees.

Gen. No. 34,687.

Heard in the first division of this court for the first district at the October term, 1930. Opinion filed March 2, 1931.

DAVID K. TONE, for appellant.

SAMUEL A. ETTELSON, Corporation Counsel, EDWARD C. HIGGINS, Special Assistant Corporation Counsel, MILLER, GORHAM & WALES and WATKINS, TEN HOOR & GILBERT, for appellees.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

Baltzer, as citizen, resident and taxpayer, filed a bill of complaint seeking to enjoin the payment by the City of Chicago of moneys claimed to be due to defendants Gorham and Gilbert for services. He made defendants thereto the City, its comptroller and treas-

urer, and Gorham and Gilbert. Defendants appeared and filed general and special demurrers which were sustained, and complainant electing to stand by his bill, a decree was entered dismissing the same for want of equity. To reverse that decree complainant has perfected this appeal.

The question to be determined is whether the bill states a cause of action. In considering that question the demurrers admit all facts well pleaded, but the allegations of the bill are construed most strongly against the pleader.

The material averments of the bill are that in the year 1907 the City of Chicago granted to certain traction companies the right to operate street railways for a period of 20 years upon payment of 55 per cent of the net proceeds into the treasury of the City; that these net proceeds as received were to be credited to a separate fund to be kept and used only for the construction of street railways by the City; that this traction fund now amounts to the sum of $54,000,000, which is in the custody of the treasurer of the City; that the traction ordinances expired in February, 1927; that the traction companies were not able to agree upon the terms of new franchises; that the security holders of the Chicago Railway Company caused a receiver to be appointed in the United States District Court; that Judge Wilkerson of that court, at the request of a group of security holders of said company, appointed a citizens' traction settlement committee; that Albert A. Sprague, John A. Carroll, Joseph R. Noel and Charles M. Thompson were so appointed; that defendants Gorham and Gilbert are practicing attorneys; that the committee was not appointed by the City, or by anyone acting for or authorized to act for the City, but was appointed with a view of protecting the interests of the Chicago Railways Company in the proceedings pending in the United States

District Court; that Gorham and Gilbert as counsel for the said committee drafted six bills that were introduced in the legislature in March, 1929; that one of these bills authorized cities and villages to grant indeterminate franchises for local transportation purposes; that another bill provided for local transit commissions in cities having a population of 500,000 or more, giving to such commissions the jurisdiction now exercised by the Illinois Commerce Commission over local transportation utilities in such cities; that another bill provided for the organization under the General Incorporation Act of corporations with authority to acquire and operate elevated and street railroads, bus lines and other transportation facilities; that another bill provided that frontage consents should not be required for laying tracks in subways and on streets in which tracks were already laid; that Gorham and Gilbert caused to be sent out to members of the legislature of the State and to other interested persons, printed matter advocating the passage of these bills, and appeared before various committees of the legislature and made arguments in support of said bills, and gave out interviews to reporters and editors of newspapers of the merits of these bills and attempted in a variety of ways to influence the members of the legislature and their friends to support the same; that on December 22, 1928, Samuel A. Ettelson, corporation counsel of the City, appointed Gorham and Gilbert assistant corporation counsel; that during the years 1928 and 1929, Frederick A. Bangs and John D. Drennan, practicing lawyers, were appointed by the corporation counsel, special assistant corporation counsel to represent the interests of the City in all matters relating to local transportation; that Ettelson claims that he appointed Gorham and Gilbert assistant corporation counsel for the purpose of acting as counsel for the citizens' traction settlement committee; that

Gorham and Gilbert have presented bills to the corporation counsel against the City amounting to $13,095 and $15,354.50, respectively; that the services rendered by them consisted solely in drafting so-called traction bills, conferring with counsel for the City, counsel for the traction companies, counsel for the receivers with reference to the said proposed bills, in appearing before the local transportation committee, the city council and the legislature of the State, and in advocating the passage of said bills; that the corporation counsel of the City intends to direct the comptroller and the treasurer to pay the amounts claimed by Gorham and Gilbert out of the traction fund of the City now in possession of the city treasurer; that no ordinance or resolution has ever been passed by the city council authorizing or directing the corporation counsel, the comptroller, the treasurer, or any official of the City to use any portion of the traction fund for the payment of any services rendered or claimed to have been rendered for the City by Gorham and Gilbert; that in case the corporation counsel cannot secure the payment of said fees of the traction fund, he intends to direct the comptroller and the treasurer to pay the same out of the funds appropriated for the corporation counsel for the year 1929; that the Annual Appropriation Ordinance passed by the City on January 5, 1929, did not provide for the payment of services rendered by Gorham and Gilbert; that the legislature of the State has never conferred upon the City the power to expend  corporate funds in the manner proposed, or the power to expend corporate revenue for services rendered in drafting proposed bills introduced before the legislature or for services rendered in lobbying before the legislature for the passage of such bills; that such payment would be an unlawful diversion of the corporate funds of the City.

The question for determination is whether the City of Chicago, in the absence of an express grant, has au-

thority to use its corporate revenue in paying the expenses of attorneys or others for the purpose of securing from the legislature legislation of the kind described in the bill.

Section 7 of the Cities, Villages and Towns Act, Cahill's Ill. Rev. St. 1929, ch. 24, ¶ 289, provides:

"The head of the law department of the city shall be the corporation counsel, and the duties heretofore performed by the city attorney shall be performed by the corporation counsel and his assistants. From and after the adoption of this Act the office of city attorney shall be abolished.

"The corporation counsel shall be and act as the legal adviser of the city council and of the several officers, boards and departments of the city. He shall appear for and protect the rights and interests of the city in all actions, suits and proceedings brought by or against it or any city officer, board or department, including actions for damages, when brought against such officer in his official capacity; *provided, however,* that when an officer or employee of the city is sued personally, even if the cause of action arose out of his official duties, the corporation counsel shall appear for such officer or employee only in case the city council directs him to do so."

This is the language of the section as amended by an act approved June 25, 1929 (see Laws of 1929, p. 208). Sections 107, 108, 111, 112 and 113 of chapter 5, article 1, of the Chicago Municipal Code provide as follows:

"Sec. 107. The corporation counsel shall have the power of appointing and removing all or any of his assistants and clerks.

"Sec. 108. He shall superintend, and with the assistance of the city attorney, prosecuting attorney and his other assistants and clerks, shall conduct all the law business of the city.

"It shall be the duty of the corporation counsel and all other officers of the city, if any, who shall be given authority to make settlement of lawsuits or controverted claims against the city of Chicago to report in writing, at the first regular meeting of the city council in each hand every month, all cases where settlements have been made of such lawsuit or claim.

"Sec. 111. The corporation counsel shall draft such ordinances as may be required of him by the city council or by any committee thereof.

"Sec. 112. The corporation counsel shall draw any deeds, leases, contracts, or other papers required by the business of the city, when requested so to do by the mayor, the city council, or the head of any department.

"Sec. 113. The corporation counsel shall, when required so to do, furnish written opinions upon subjects submitted to him by the mayor, the city council or by the head of any department."

There is no doubt of the general rules applicable. A municipality has only such express powers as are granted to it by the State and such powers as are necessarily implied in the powers expressly granted. A municipal corporation derives its existence and all its powers from the general assembly of the State. It possesses no inherent powers but has only such as are granted by statute, and these powers are strictly construed. Where there is a fair and reasonable doubt of the existence of a power asserted, the doubt is resolved against the municipality. The city council has power to appropriate money for corporate purposes but the corporate purpose must be germane to the purpose for which the corporation was created and must have a legitimate connection with those objects. These are the fundamental principles which are clearly set forth in the recent case of *Elsenau v. City of Chicago,* 334 Ill. 78.

But while such are the general rules, there is a diversity of opinion in the courts of the different States as to the application of the rules to a particular state of facts. In *In re Taxpayers and Freeholders,* 50 N. Y. S. 356, it appeared that there was an application of taxpayers and freeholders for a summary investigation of the financial affairs of the village under a statute and an order of a justice, who made an investigation and entered an order denying the right of the city to pay certain items of expense. One of these items was for attorney's fee for appearing before committees of the legislature to secure the passage of a law to bond the village for certain public improvements. The court, with some hesitation, held that the item was a proper charge.

In *Bachelder v. Epping,* 28 N. H. 354, the selectmen of that municipality called a meeting of the inhabitants, who voted to raise $1,500 to purchase land and to erect a courthouse, if the court of common pleas should hold court in that municipality instead of in Exeter. The meeting appointed a committee to apply to the legislature to that end. The committee performed the service and presented a bill for necessary expenses incurred. The case was referred to an auditor who reported that the expenses were incurred and the bill was otherwise proper and should be paid, if it was legal to do so. The court held that the town was liable just as an individual would be liable under similar circumstances.

In *Farrel v. Town of Derby,* 58 Conn. 234, 20 Atl. 460, 7 L. R. A. 776, the Supreme Court of Connecticut held that a town could expend money to employ counsel to defend its territorial integrity before the legislature of the State.

In *Field v. City of Shawnee,* 7 Okla. 73, an expenditure made in employing a lawyer to appear before the secretary of the interior to secure the location of a rail-

road line within the limit of a municipal corporation was held to be ultra vires in the sense that it was wholly without the scope of the purpose for which the corporation was created, if not prohibited by statute. The opinion there distinguishes between powers which are wholly ultra vires and those which are ultra vires because some required person has not given consent as prescribed and others because the particular act was not authorized for a particular purpose.

In *Shannon v. City of Huron*, 9 S. D. 356, it was held that expenses to promote a campaign to have the capitol of the state located in the City of Huron were incurred without authority, since such expenses would raise the debt limit of the city above the amount fixed by a constitutional limitation. In *Colusa County v. Welch*, 122 Cal. 428, an allegation of a bill that if the amount "was agreed to be paid to said Sprague, it was to secure, by means of personal solicitation and by means of private interview with members of the legislature of California, and by means of lobbying, the defeat of said senate bill," was held to bring the case within the rule against such expenditures stated by Judge Cooley in Cooley on Constitutional Limitations, 6th ed. 163. In *State v. Superior Court*, 93 Wash. 267, an expenditure for influencing an election was held illegal and without the powers of a municipal corporation. In *Westbrook v. Deering*, 63 Me. 231, it was held (contrary to the Connecticut case) that a town could not incur expenses in opposing before a legislature committee a division of its territorial limits. In *Henderson v. City of Covington*, 14 Bush (Ky.) 312, it was held that the city might not incur expenses in procuring legislation which would increase the powers of the city so as to permit it to build a bridge over the Ohio river.

In *Valentine v. Robertson*, 300 Fed. 521, a suit was brought to enjoin the payment by the City of Juneau,

Alaska, of the sum of $2,000 to defray the expenses of one Robertson in going to Washington, D. C., and using his best endeavors to forward the passage of legislation advancing certain projects. These included the division of the territory of Alaska, the erection of a government dock and government building at Juneau, the dredging of Gastineau Channel at Juneau, the dredging of a canal from Hawk Inlet to Stevens Passage and a canal connecting Stevens Passage with Oliver's Inlet, the establishment of a mail route on the north shore of Chichagof Island and of a land office at Juneau, the dredging of Wrangell Narrows, to work with the delegate from Alaska to secure the passage of a bill to authorize Juneau to issue bonds for street improvements and the establishment of permanent streets in the city. The opinion of the court reviews the authorities, including those above cited, and states:

"The City of Juneau has the benefit of the aid of a delegate to Congress from the territory of Alaska, upon whom it may call for the furtherance of any necessary legislation in Congress. We hold that it has no authority, express or implied, to engage and pay for out of the public funds an emissary to go to Washington to lobby for the passage of the pending bill to authorize the city to issue bonds for street improvements or for the furtherance of any of the projects mentioned in the resolution of January 29, 1924."

The judgment in favor of the city was therefore reversed and the cause remanded with directions to grant the injunction as prayed in the bill. That opinion discusses quite at length the case of *Meehan v. Parsons*, 271 Ill. 546. In that case certain taxpayers filed their bill to enjoin the payment by the City of Cairo to one Parsons the sum of $1,500 which had been allowed and ordered paid to him by the city. A temporary injunction issued, which was afterwards dissolved and upon final hearing the bill was dismissed and on

appeal to the Appellate Court the decree was reversed. The cause was originally heard upon the bill and answer. The facts were that Parsons during the year 1912 attended sessions of Congress in Washington to lobby for and obtain, if possible, an appropriation from the federal government of money to build levees and embankments in and about Cairo and a drainage district adjacent thereto. Parsons was then the mayor of Cairo and received a salary of $1,000 per annum. The work which he did at Washington was done on behalf of the Cairo Drainage District, a municipal corporation lying outside the City of Cairo, and on behalf of railroads and other corporations and himself, as well as on behalf of Cairo. It appeared that the amount asked by Parsons was only for his actual, reasonable, necessary and suitable expenses proper to be incurred by him in the accomplishment of his work; that he had paid and advanced an amount in excess of $1,500 on behalf of the city; that he claimed no compensation from the City of Cairo for his time or services; that a flood in the Ohio and Mississippi Rivers, occurring after the passage of the annual appropriation bill of Cairo, demonstrated the necessity of raising and strengthening the levees of Cairo and the impracticability of providing a sufficient sum for the work without assistance from the general government in order to complete the necessary work before the next spring rise in the rivers should menace the safety of the city; that an emergency therefore arose which was unexpected at the time the annual appropriation bill was passed; that Parsons, as mayor of the city, made three trips to Washington; that he lobbied, interviewed and importuned senators and congressmen on behalf of Cairo for an appropriation, and remained in Washington until an appropriation of $250,000 was secured by an act of Congress.

The principal contention there, as here, was that it was contrary to public policy for the city to reimburse

for expenses incurred in lobbying, and authorities were cited to the proposition that an agreement for compensation contingent upon obtaining legislation was void and that a contract to promote the passage of laws and ordinances and paying expenses or compensation therefor was against public policy and could not be enforced. The court said:

"The courts have not gone so far as to hold that in no event and under no circumstances is it proper to interview and importune members of a legislative body to enact certain legislation in which the party importuning them may be interested. The interests of the City of Cairo would undoubtedly be affected by whatever action Congress should choose to take in reference to the appropriation for the building of its levees. Should Congress refuse to appropriate any sum whatever, the whole burden of building and maintaining its levees would rest upon the city. That burden would be lightened by whatever appropriation Congress should see fit to make. The city therefore had the undoubted right to authorize its chief executive to appear before the various congressional committees and interview the members of Congress to urge upon them the claims of the city and to advance any legitimate argument in favor of the passage of an appropriation bill for the relief of the city in this respect." The judgment of the Appellate Court was reversed and the decree of the circuit court was affirmed.

As stated in the beginning of this opinion the elementary rules that should control are well settled, but the application of these rules under different statutes and different circumstances that arise is a more difficult matter. There is no doubt that a municipality is without the power or right to appropriate the money of the taxpayers for any purpose which would serve a private end merely or that would not be for the benefit of the whole number of taxpayers and citizens within its limits. Here by express legislation, the State

seems to have given to the corporation counsel of the City of Chicago full and complete control of the law business and legal affairs of the city. Moreover, the legislature of the State has expressly conferred upon the City of Chicago the power to construct or acquire street railways, not only upon the surface of the streets but also above or beneath the surface. It has also given the city power to construct subways for street railways and to lease the same to street railway companies. It is held not unlawful for the City to grant street railways the exclusive use of subways, and in the exercise of its power to construct subways it may use the traction fund already described. *Barsaloux v. City of Chicago,* 245 Ill. 598. Where powers such as these are conferred upon the city and where it has such large financial interests, it would be an unusual and extraordinary view to hold that it might not employ counsel to protect its interests either in court or before the State legislature. It must, we think, be held that with the grant of these great powers by implication the legislature also gave authority and right to obtain legal advice necessary for the proper use and preservation of the same.

There is no allegation here that the services of Mr. Gorham and Mr. Gilbert were in the direction of bringing any improper influence to bear upon the legislature by private interviews with members, or otherwise. We would not hesitate to condemn any agreement for such services. Nor is there any complaint that the fees charged are excessive. Indeed, counsel for complainant upon oral argument stated that in his opinion the charges were less than they should be.

The point is also made in complainant's original brief that the bill alleges that this expense was not appropriated for in the annual appropriation ordinance for the year 1929, as required by section 2, article 7, of the Cities and Villages Act, Cahill's St. ch. 24, ¶ 92,

397

and it is urged that the demurrer should not have been sustained for that reason. The contract was made in December, 1928, as the bill alleges. There is no allegation that the appropriation for the office of corporation counsel for that year was exhausted. The point cannot be sustained. *City of Chicago v. Berger*, 100 Ill. App. 158.

The demurrers were properly sustained, and the decree dismissing the bill is affirmed.

*Affirmed.*

O'CONNOR and McSURELY, JJ., concur.