*In re* APPLICATION OF EDWARD J. ROSEWELL, County Treasurer.—
(EDWARD J. ROSEWELL, Collector-Appellant, *v.* THE CITY OF CHICAGO, Objector-Appellee.)

First District (2nd Division)   No. 77-1277

Opinion filed March 6, 1979.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Henry A. Hauser, and Michael F. Baccash, Assistant State's Attorneys, of counsel), for appellant.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Richard F. Friedman, Assistant Corporation Counsel, of counsel), for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:

This appeal arises from a judgment of the circuit court of Cook County on an application for judgment and order of sale against 82 parcels of real estate returned delinquent for the nonpayment of real estate taxes in 1973. The City of Chicago, owner of the fee simple interests in the subject properties, objected to the real estate tax assessments against these properties. On cross-motions for summary judgment, judgment was entered for the city. The county collector appeals.

The sole issue presented is whether the contractual agreements between the City of Chicago and other persons for the operation of parking facilities on the subject properties constituted leases for purposes of section 26 of the Revenue Act of 1939 (Ill. Rev. Stat. 1977, ch. 120, par. 507), which provides as follows:

> "When real estate which is exempt from taxation is leased to another whose property is not exempt, and the leasing of which does not make the real estate taxable, the leasehold estate and the appurtenances shall be listed as the property of the lessee thereof, or his assignee, as real estate."

The parties stipulated that all of the subject properties were owned by the City of Chicago during the period in question, that all were improved with parking facilities which were operated by persons other than the city under written agreements, that all were assessed by the county collector during 1973, and that all such assessments were not against the tax-exempt fee interest of the city, but rather were against the

interests, if any, of the parking lot operators. Incorporated in the stipulation was a copy of an ordinance which authorized the city's execution of the agreements and which presented the text of a "City of Chicago Parking Facility Agreement" agreed to be of the same form and substance as each of the 82 agreements executed. A summary of the terms of this agreement of importance to this appeal follows.

The agreement is described as the "CITY OF CHICAGO PARKING FACILITY OPERATOR'S AGREEMENT." The preliminary paragraphs state that the city "hereby grants to the Operator the privileges hereinafter described," that the agreement constitutes the entire agreement between the parties, and that the duration of the agreement is for one calendar year, unless sooner terminated.

Article I defines the "Bureau of Parking" as that agency of the city "having management and control of the establishment, operation and maintenance of parking facilities"; "Commissioner" is defined as "the Commissioner of Streets and Sanitation of the City of Chicago, or any other official designated by the City Council to have administrative supervision over the Bureau of Parking"; and "Operator" is defined as an entity which "owns, controls, manages and directs the business of parking motor vehicles."

Article II provides that "the Operator shall not assign or transfer this agreement nor any of the rights or privileges granted hereby, nor enter into any contract requiring or permitting the doing of any act hereunder by an independent contractor, unless otherwise expressly provided herein, without prior written approval signed by the Commissioner." This article continues that if "the control of the said [operator] entity changes at any time during the term hereof, the City may * * * take immediate possession of said premises and facility* * *." By virtue of article II the city and the operators are not to be considered co-partners or joint venturers.

Article III provides that the operator's "taking possession" of the premises shall constitute conclusive evidence of "his receipt thereof" in satisfactory condition.

Article IV requires that the operator keep the premises in a safe, sanitary and sightly condition, and in good repair and "yield the same back" to the city upon termination in such condition. If the premises are not so kept by the operator, the city may enter the premises "without such entry constituting a termination of the privileges herein granted or an interference with the possession of or constructive or other eviction * * *."

Article V prohibits the posting of signs, billboards, posters, or other advertisements in the facility by the operator without the prior written

approval of the commissioner. The right to post such signs is reserved to the city.

Artice VI provides that "the Operator shall make no alterations or additions to the premises and facility * * * without the prior consent of the City* * *."

Article VII lists seven categories of maintenance responsibilities including "minor necessary repairs" to be assumed by the operator. The power to determine whether a repair is minor is reserved to the city. The operator's failure to fulfill these duties empower the city to "enter upon said premises" to insure compliance. The operator agrees to reimburse the city for all costs and expenses incurred by the city in entering and fulfilling the operator's maintenance responsibilities.

Article VIII lists 10 categories of duties imposed on the city including making necessary major repairs; supplying and maintaining all cash registers and pavement markings; supplying all parking tickets and forms, and light bulbs and fuses; and maintaining all directional, informational, and advertising signs.

Article X states that the operator agrees to operate the facility "for the convenience of the public * * * and shall use and occupy the above premises solely for off-street parking of motor vehicles * * * shall use his best efforts to secure, maintain and develop the parking business conducted by him * * * and to increase the same whenever and wherever possible, and shall refrain from and prevent the diversion of any such parking business from the facility whenever possible."

Under article XI the operator agrees to operate the facility 24 hours per day, seven days per week, unless otherwise instructed by the commissioner.

Article XII prohibits the removal of any such vehicle by the operator without the consent of the owner, except with the prior written approval of the commissioner. The article also forbids the parking of commercial vehicles without the commissioner's written approval. At no time may an operator permit the parking of a vehicle free of charge.

Under article XIII the operator agrees to have all employees wear uniforms, caps, and badges of a color and design approved by the city.

Article XV provides that, in the event of damage or destruction of the facility, the city may require the operator to submit plans for repairs or may declare the facility beyond repair and terminate the agreement.

Article XVIII fixes the rates to be charged for parking and reserves the right to adjust such rates to the city.

Article XIX defines the terms used in computing and the procedure used in distributing the revenues from the facilities. The "basic or minimum fee" of the operator is defined as "that amount of

compensation" which the city regards as reasonable for "management services to be rendered by the Operator" for a normal level of operation. If the facility's revenues exceed a stated amount, the operator's fee is adjusted according to a schedule designed to maintain the fee at approximately 4% of the gross revenue. This additional fee is subject to change in accordance with changes in the parking rates. This article also provides that the operator is to advance all license fees, taxes, and charges assessed and is to pay to have an armored car service deliver the facility's revenues daily to the city. These and all other expenses incurred by the operator must be presented in a budget for the city's approval. The operator is reimbursed for these expenses by the city.

Article XXII provides that if the operator abandons the operation of the facility for more than 10 days, "the Operator's right to possession of the premises and facility thereupon shall cease and terminate." Under this provision "the Operator agrees to surrender to the City possession of the premises and facility immediately without notice * * * and the Operator * * * grants to the City full and free license to enter into and upon said premises and facility * * * to take possession thereof without such entry constituting a trespass or forcible entry and detainer."

## I.

The general definition of a lease is well settled[1]:

"Whatever is sufficient to show that one party shall divest himself of possession and the other party shall come into it for a determinate time and for a fixed rental amounts to a lease." (*Miller v. Gordon* (1921), 296 Ill. 346, 350, 129 N.E. 809.)

The stipulated facts clearly establish that the agreements were for fixed terms. However, it remains to be determined whether the parties intended to transfer possession to the operators sufficient to effect the transfer of a leasehold estate resulting in the payment of rents.

## A.

Relying primarily on articles III, IV, VII, X, and XXII and the parties' stipulation that the operators actually operated the facilities, the collector asserts that the operators had exclusive possession of the facilities. Although the city concedes that the operators had possession of the facilities, it refers us to articles VIII, XII, XIII, and XVIII which delineate

---

[1] The term "lease" is not defined in the Revenue Act. (See Ill. Rev. Stat. 1977, ch. 120, par. 482.) The only authority bearing on the construction of this term as utilized in the Act appears in *Dee-El Garage, Inc. v. Korzen* (1972), 53 Ill. 2d 1, 289 N.E.2d 431, in which amendatory language extending the scope of section 26 of the Act (Ill. Rev. Stat. 1977, ch. 120, par. 507) to include all uses of real property was held unconstitutional. Based on our research, we conclude that no special meaning of "lease" for the purposes of this Act was intended by the legislature.

the operators' actions which are subject to the control and management of the city. Thus, the city contends that the operators' mere possession without any control over the use of the premises fails to transfer a leasehold estate and at most gives the operators licenses to operate the facilities for the city.

The distinction between a lease and a license, and the guiding principles for the determination of this distinction, were set forth in *Holladay v. Chicago Arc Light & Power Co.* (1st Dist. 1894), 55 Ill. App. 463, 466-67:

> "Whether a contract be a lease or a license will be determined, not from what the parties to it may choose to call it, nor from the language used, but from the legal effect of its provisions.
>
> 'An instrument is not a demise or lease, although it contains the usual words of demise, if its contents show that such was not the intention of the parties.' 1 Woodfall's Landlord and Tenant, 125; Wood's Landlord and Tenant, Sec. 227.
>
> Whether a tenancy is created or not depends upon the intention of the parties, although this intention must in most cases be inferred from the circumstances which attend the case. 'In general, the question of possession will determine the matter.' Alwood v. Ruckman, 21 Ill. 200; see, also, Gunning Co. v. Cusack, 50 Ill. App. 290.
>
> 'An instrument that merely gives to another the right to use premises for a specific purpose, the owner of the premises retaining the possession and control of the premises, confers no interest in the land and is not a lease, but a mere license.' Wood's Landlord and Tenant, Sec. 227.
>
> A lease possesses the property of passing an interest in the land, and partakes of the nature of an estate. Taylor's Landlord and Tenant, Sec. 14.
>
> A license is an authority to do some act on the land of an other, without passing an estate in the land, and 'being a mere personal privilege, it can only be enjoyed by the licensee himself, and is not therefore assignable so that an under tenant can claim privileges conceded to a lessee.' Ibid., Sec. 237a.
>
> Exclusive possession is essential to the character of a lease. Central Mills v. Hart, 124 Mass. 123."

■■ Thus, although the reservation of a concurrent right of possession or the restriction of the rights granted to a single use does not necessarily prevent an instrument from having the effect of transferring a possessory interest and constituting a lease (see *Gustin v. Barney* (2d Dist. 1928), 250 Ill. App. 209), an agreement which merely entitles one party to use property subject to the management and control of the other party does

not constitute a lease, but rather grants only a license (*Holladay*; see also *Illinois Central R.R. Co. v. Michigan Central R.R. Co.* (1st Dist. 1958), 18 Ill. App. 2d 462, 480-81, 152 N.E.2d 627).

■■ Under these agreements the hours of operation (art. XI); the color and design of the uniforms, badges, and caps of the employees (art. XIII); the posting of signs (art. V); the setting of parking rates (art. XVIII); the types of vehicles to be parked (art. XII); the operators' ability to subcontract for work done on the premises (art. II); the operators' ability to make alterations and additions to the premises (art. VI); the marking of pavement lanes, and the types of cash registers and forms to be used (art. XIII); the operators' budget (art. XIX); and the major maintenance responsibilities (art. XIII) are all within the city's control. Since the legal effect to be given an instrument is not to be determined by the label it bears or the technical terms it contains (*Bonde v. Weber* (1955), 6 Ill. 2d 365, 377, 128 N.E.2d 883), the word "possession" in the articles relied on by the collector and the description of the grant as "privileges" do not alter our conclusion that the foregoing articles vested the control of the premises in the city. Under these circumstances, we find that the agreements were not intended to transfer a possessory interest coupled with the control necessary to create a leasehold estate. Our opinion that the operators were granted licenses to operate the facilities under the control of the city is further supported by the financial arrangements provided for in the agreements.

### B.

Rent is compensation for the use of land, and what the tenant pays rent for is quiet possession or beneficial enjoyment. (*Cottrell v. Gerson* (1939), 371 Ill. 174, 181, 20 N.E.2d 74.) The collector relies primarily on article XIX which in short provides that the rent equals gross revenues minus expenses minus the amount paid to the operator. Then pointing to *Barsaloux v. City of Chicago* (1910), 245 Ill. 598, 92 N.E. 525, and *Lacey v. Newcomb* (1895), 95 Iowa 287, 63 N.W. 704, the collector contends that the operators pay rent to the city for the lease of its properties. We disagree.

■■ First, this case does not deal with the diminishment of the value of the properties by the depletion of natural resources by a lessee. Therefore, we find the holding of *Lacey*, that royalties paid by mining companies to landowners for the use of their land constitute rent, inapposite to the question posed here. Secondly, the nature of the relationship between the parties in *Barsaloux* was not in issue. Therefore, we find that the court's reference to that agreement as a lease and the division of gross revenues as rent to be *obiter dicta*. Finally, although payments from a lessee to a lessor based on a percentage of receipts may

constitute rent, we find nothing in article XIX to support the proposition that consideration in the form of rent flows from the operator to the city.

Under article XIX, all of the gross revenues are transferred directly from the operators to the city. Although the operators are required to advance all license fees, taxes, and other expenses, they are reimbursed for these expenses from the city. Also from these revenues, the city pays the operators "compensation which * * * represents a reasonable base *payment for management services* to be rendered by the Operator." (Emphasis added.) Using the figures and formula supplied in the collector's brief, we note that, without considering the amount deducted for expenses, the city would extract a "rental" of nearly 96% of the gross revenues. We believe it would be unrealistic to characterize this percentage of the profits as rent flowing from the operator to the city.

In light of the relatively small percentage of the revenues returned to the operators, the clear language of the agreements characterizing such payments as being for services, and the extent to which the city has retained control of the premises, we are of the opinion that the agreements were intended to transfer possession to the operators solely for management purposes for which the operators were to be paid a salary. Therefore, we conclude that these agreements do not constitute leases, but rather grant the operators licenses to operate the facilities for the public's benefit. Accordingly, we affirm the summary judgment of the circuit court of Cook County for the city.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.