THIRD DIVISION

June 30, 2003

No. 1-02-3135

MARIA LEONARDI, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. ) 

)

CHICAGO TRANSIT AUTHORITY, a municipal ) 

corporation, and CITY OF CHICAGO, a ) Honorable municipal corporation, ) John G. Laurie,

) James P. McCarthy,

Defendants-Appellees. ) Judges Presiding.

JUSTICE WOLFSON delivered the opinion of the court:

Plaintiff Maria Leonardi stepped into a large crack in the sidewalk at the Jefferson Park bus station and injured her right foot.  Leonardi sued the Chicago Transit Authority (CTA) and the City of Chicago (City), alleging defendants had negligently failed to maintain the sidewalks and curbs at the bus station.
(footnote: 1)  

The City filed a motion for summary judgment, contending it had no duty to Leonardi because it had no management authority or control over the sidewalks at the Jefferson Park bus station.  The court granted the City's motion.  

On appeal, the sole issue is whether the City had possession and/or control of the bus station's curbs and sidewalks.
(footnote: 2)  If not, the City cannot be held liable for Leonardi's injuries.  We affirm.

BACKGROUND

Parties provided the trial court with evidence concerning the details of Leonardi's fall and injury and the degree of the City's control over the sidewalks and curbs at the Jefferson Park bus station.  Only the evidence pertaining to the issue of the City's duty toward Leonardi is discussed here.

Operation and Maintenance Agreement

The City and the CTA entered into an "Agreement for the Operation and Maintenance of the Kennedy Rapid Transit Facility" (the Agreement).  The parties do not dispute the Agreement applies to the Jefferson Park bus station.

According to the Agreement, the City passed an ordinance on April 23, 1945, granting the CTA "the exclusive right and authority to establish, construct, reconstruct, maintain and operate the transit system for the local transportation of passengers within the City."  Under another ordinance, the City council authorized the extension of the then-existing transit system from the Logan Square Terminal to a proposed new terminal.   Under the Agreement, the City undertook the construction of the extension and terminal.  Upon completion of the extension, the City would "
convey
 to [the CTA] for and in consideration of one dollar ($1.00) and other good and valuable consideration such rights as shall be necessary to allow [the CTA] to maintain and operate said rapid transit facility and appurtenances thereto."  The only portion of the transit facility over which the City retained any maintenance responsibilities was the landscaping.

The CTA agreed to "operate and maintain [the facility] as an integral part of its total system" and "maintain the *** facility and any and all appurtenances thereto in accord with the highest engineering standards."  If necessary, the CTA would replace the facility and appurtenances "in accordance with the terms and provisions of City of Chicago ordinance of April 23, 1945, granting [the CTA] the 
exclusive right of operation
 of facilities for local transportation within Chicago."  (Emphasis added.)  The CTA also agreed to hold the City harmless for claims arising out of the operation and maintenance of the facility and its appurtenances.  

If the parties determined the facility was no longer needed to serve the public, the CTA could, with one year's written notice to the City, cease operations and remove the facility and appurtenances.  At that time, all rights the CTA possessed in the property would be "reconveyed" to the City.   

Thomas Ambry

Thomas Ambry, an assistant project director employed by the City of Chicago, testified he oversees capital improvements on transit facilities.  He explained the City does not repair sidewalks that have fallen into disrepair at those facilities:

"Q.  If a sidewalk or a curb needed to be repaired at the Jefferson Park bus terminal within that area, do you know who would make those repairs?

***

A.  Physically or -- responsibility[?]

Q.  *** Let's start with responsibility.

A.  CTA.

***

Q.  Do you know if the city ever would participate in repairing the sidewalk and curbs in those areas?

A.  No.

***

Q.  Do you know if the Chicago Department of Transportation participates in repairing any of the areas within the bus stations or L stations that are controlled by the CTA?

A.  No, we don't do them."

He also explained what he does when he receives a complaint about the sidewalk at the terminal:

"Q.  So if it comes to your attention, someone calls you and says, 'Hey, the Jefferson Park bus terminal, a huge part -- chunk of the sidewalk is missing, we want you guys to fix it,' what would your response be to that?

A.  'Call CTA.'  I would -- you know, they will tell them to call CTA.

***

Q. *** What if someone did complain about the curb or the sidewalk at Jefferson Park, who would you funnel them to?

A.  To CTA."

Ambry explained the only time the City is involved in maintenance of the sidewalks is when the City undertakes a capital improvement that involves tearing up the sidewalk.  As part of the improvement, the City replaces the sidewalk and sometimes guarantees its work for one year.  Ambry gave examples of capital improvements: structural improvements; "gutting a station"; new floors, walls, and ceilings.  When shown a photo of the portion of a curb in disrepair (presumably the curb at issue here), Ambry said repair of the curb would not be a capital improvement project.    

Kenneth Rigan

Kenneth Rigan, the general superintendent of administration for the Chicago Department of Transportation, Bureau of Streets, also testified the City performs no maintenance over the CTA property without CTA authority.  

DECISION

Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  735 ILCS 5/2-1005(c) (West 2000).  We review an order granting summary judgment 
de
 
novo
.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).

In a negligence action, the plaintiff must provide sufficient facts showing the existence of a duty owed to her by the defendant, a breach of that duty, and an injury proximately resulting from the breach.  
Vesey v. Chicago Housing Authority
, 145 Ill. 2d 404, 411, 583 N.E.2d 538 (1991).  Where the plaintiff fails to provide facts "from which the court could infer the existence of a duty," summary judgment for the defendant is appropriate.  
Vesey
, 145 Ill. 2d at 411.  The existence of a duty is a question of law to be determined by the court.  
Vesey
, 145 Ill. 2d at 411. 

Leonardi contends that despite the Agreement, as owner of the property the City retained sufficient control over the property to create a duty on the City's part to maintain the sidewalks.  She cites section 3-102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act), 745 ILCS 10/3-102(a) (West 2000).  That section states:

"(a) Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition."  745 ILCS 10/3-102(a) (West 2000).

This statute does not create any new liabilities but rather codifies the common law duty to which the immunities in the remainder of the Act apply.  
Vesey
, 145 Ill. 2d at 414.  As noted in 
Vesey
, section 3-102 must be read in conjunction with other common law principles, such as the principle in landlord-tenant law that a landlord is not responsible for injuries cause by a defective condition existing on his premises leased to a tenant and under the tenant's control.  
Vesey
, 145 Ill. 2d at 414.  The ultimate question here is whether the City "actually exercised control over and was obligated to maintain" the sidewalks and curves of the Jefferson Park bus station, thereby establishing the existence of a duty to Leonardi.  
Bowen v. City of Harvey
, 164 Ill. App. 3d 637, 639, 518 N.E.2d 203 (1987).  

The City contends the Agreement is a lease and, under 
Vesey
, the City is not responsible for injuries caused by a defective condition on the leased property under the tenant's control.  Leonardi, on the other hand, characterizes the Agreement as a license to avoid the implications of landlord-tenant law.  The Agreement does not fit squarely within the definition of either a lease or a license. 

A lease provides a lessee with exclusive possession of the leased premises.  
Jewelers Mutual Insurance Co. v. Firstar Bank Illinois
, Nos. 1-00-1670 & 1-00-1766 (Ill. App. Mar. 31, 2003).  To qualify as a lease contract, "there must be an agreement as to the extent and bounds of the property, the rental price and time and manner of payment, and the term of the lease."  
Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.
, 114 Ill. 2d 133, 145, 500 N.E.2d 1 (1986).  

The Agreement is not a lease nor does it satisfy the requirements of a valid lease.  Although the Agreement defined the extent and bounds of the property as seen in the map attached to the Agreement, the Agreement does not provide for rent.  Also, the City does retain maintenance responsibilities over the landscaping and may perform capital improvements at the facility.

We also reject Leonardi's attempt to categorize the agreement as a license.  A license is "an authority to do some act on the land of another, without passing an estate in the land, and 'being a mere personal privilege, it can only be enjoyed by the licensee himself, and is not therefore assignable so that an under tenant can claim privileges conceded to a lessee.' "  
In re Application of Rosewell
, 69 Ill. App. 3d 996, 1001, 387 N.E.2d 866 (1979).  An agreement that "merely entitled one party to use property subject to the management and control of the other party does not constitute a lease, but rather grants only a license."  
In re Rosewell
, 69 Ill. App. 3d at 1001-02.   

The Agreement grants a much greater interest in the property than a license.  With the exception of the City's responsibility to maintain the landscaping, the CTA has exclusive authority to maintain and operate the facility.  The City retained no other control over the property.  Moreover, the agreement uses the terms "convey,"  "reconvey," and "exclusive rights" in describing the transfer of rights between the City and the CTA.  These words establish the CTA received more than merely a "personal privilege."

If the Agreement is neither a lease nor a license, what effect, if any, did the Agreement have on the City's duty to maintain its property?  
Pond v. City of Chicago
, 35 Ill. App. 2d 378, 183 N.E.2d 179 (1962) is instructive here.

In 
Pond
, the legislature created the Commissioners of Lincoln Park, which held the public park in trust.  In 1879, the legislature also gave the commissioners the power to acquire public streets leading to the park.  The power and authority of the park commissioners over the land "has been construed as excluding like possession and exercise by the city."  A subsequent city ordinance passed in 1893 granted the commissioners the right to take, regulate, control, and improve a portion of Sheridan Road.  The board was the predecessor of the Chicago Park District.   

The plaintiff was injured on a sidewalk that fell within the portion of Sheridan Road that was the subject of the 1893 ordinance.  She sued the City.  The trial court granted summary judgment for the City.

On appeal, we noted the Park District was responsible for maintaining the sidewalk over which the district had jurisdiction because of the ordinance transferring control.  
Pond
, 35 Ill. App. 2d at 381.  The plaintiff argued the City could not evade by contract its duty to keep its streets safe for public travel and cited a number of cases in support, including 
Hogan v. City of Chicago
, 168 Ill. 551, 48 N.E. 210 (1897), on which Leonardi relies.  We stated:

"These cases are distinguishable.  There the cities involved had contracted with private parties for the improvement, care or repair of the cities' streets.  In the instant case one public agency pursuant to legislative enactment transferred to another public agency control of the street involved and thereafter the transferrer ceased to have or exercise any power or control.  It was not a matter of contract.  
It was a division of public duties pursuant to statute
."  (Emphasis added.)  
Pond
, 35 Ill. App. 2d at 381-82. 

Here, as noted in the Agreement, the CTA is a municipal corporation -- a creation of the legislature.  The Agreement between the CTA and the City was made pursuant to a city ordinance granting the CTA the "exclusive right" to maintain and operate the transit system.  The authority to build Jefferson Park bus station, which would become a part of the transit system, also came from a city ordinance.  This agreement, like that in 
Pond
, is a "division of public duties" between public entities pursuant to legislative enactments.  

Like the arrangement in 
Pond
, the Agreement transferred to the CTA total control over the facility, with the exception of landscaping maintenance.  The only other area over which the City retained any control was capital improvements.  As Ambry testified, sidewalk repairs do not fall under the ambit of capital improvements.  Thus, the City had no control over the sidewalk where Leonardi fell, and, hence, no duty toward Leonardi.   

Because Leonardi cannot establish the existence of a duty, her claim against the City fails.  The trial court correctly granted summary judgment in favor of the City.

CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.    

SOUTH, P.J., and HOFFMAN, J., concur.

FOOTNOTES
1:
The CTA filed a motion to dismiss itself from the case, based on Leonardi's failure to comply with notice requirements.  The trial court granted the motion and dismissed the CTA. 
 

2:
In her brief on appeal, Leonardi presents two issues pertaining to the dismissal of the CTA.  She subsequently filed a motion to voluntarily dismiss the CTA from this appeal.  That motion was granted by this court on April 3, 2003.