THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHICAGO METRO CAR RENTALS, INC., Defendant-Appellant.

First District (5th Division)    No. 78-1040

Opinion filed May 18, 1979.

Seymour H. Blum, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., and Michael F. Baccash, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Plaintiff (the State) filed a complaint seeking to collect delinquent 1975 real estate taxes from defendant (Metro), the alleged owner of certain real property. The trial court granted summary judgment in favor of the State, finding that Metro leased* the subject property from the City of Chicago (the City). On appeal, Metro contends only that the trial court erred in finding that an "Airport Concession Agreement" between itself and the City constituted a lease.

The following facts are pertinent to a disposition of this appeal.

On March 22, 1974, the City and Chicago Budget Rent-a-Car, Inc. (Budget) entered into an "Airport Concession Agreement" whereby Budget was granted a "non-exclusive privilege * * * to operate a rent-a-car business on, upon and from" Chicago-O'Hare International Airport and "for no other purpose whatsoever." The record is unclear as to whether Budget subsequently assigned its rights and obligations under the agreement to Metro or whether, as contended by Metro at oral argument, Budget subsequently changed its corporate name to Metro. However, the parties agree that Metro was a party to the agreement during the relevant period. Accordingly, we shall treat the agreement as existing between the City and Metro rather than Budget.

The agreement states that Metro "desires to lease certain space, and to obtain certain rights and privileges with respect to the operation of a rent-a-car service" at the airport. The agreement commenced on March 22, 1974, and was to end on February 23, 1992, unless sooner terminated pursuant to provisions of the agreement. The City retained the right to seek renegotiation of the terms and conditions relating to compensation at five year intervals. Metro agreed to negotiate in good faith when notified that the City sought such a change. In the event that the said terms were not renegotiated to the City's satisfaction within six months, the agreement would terminate. Metro agreed not to "assign, sublet or transfer" the agreement without the City's approval.

Article V of the agreement, titled "Demised Premises," explicitly states that the City "demises and leases" certain described premises. The City retained a right of entry for purposes of future installation, maintenance and repair, but agreed that such entry would "be performed

---

* Lessees of tax-exempt bodies are liable for taxes assessed against their leasehold estates. (See Ill. Rev. Stat. 1975, ch. 120, par. 507.) Metro does not contest this point.

so as to interfere as little as reasonably possible" with Metro's operation. The premises "demise[d] and lease[d]" were as follows:

(1) 248 square feet of counter space on the first floor concourse of Terminal Building 2, the precise location thereof to be determined by the commissioner of aviation;

(2) 248 square feet of counter space on the first floor concourse of Terminal Building 3, the precise location of the counter to be determined by the commissioner of aviation;

(3) Temporary Automobile Service Area A, a 52,027.40 square foot area which was legally described and diagrammed in the agreement for which was to be used for storage and maintenance of automobiles;

(4) Permanent Service Area B, a 203,250 square foot area upon which Metro agreed to expend $750,000 for construction of certain buildings and improvements for "use in maintenance, servicing, parking and storage of its vehicles."

The agreement further allowed the commissioner of aviation to relocate the counter areas upon 90 days written notice if modification or expansion of the Terminal Buildings necessitated. The City would bear the cost of such relocation. Metro agreed to vacate Temporary Service Area A within 10 days of completion of Permanent Service Area B. The "rental with respect to Temporary Service Area A [would] thereupon terminate."

Concession and rental fees were provided for under the agreement. The City was to receive 10% of the gross receipts as a concession fee, with a minimum guarantee of $185,000 for the first year. The concession fee and minimum guarantee were subject to future adjustment. The City was also to receive $268.67 per month as "rental" for the two counter areas and $433.56 per month as "rental" for Temporary Service Area A.

The agreement further provided that rates to be charged the public for rent-a-car services were subject to approval by the commissioner of aviation; that employees and invitees of Metro must conduct themselves in an orderly and proper manner; and that business could be solicited only from the counter areas. Metro agreed also to provide good, prompt and efficient service and to keep "the facilities demised to it" open for a sufficient amount of time to meet reasonable demands for services. Metro further agreed to indemnify the City for liability resulting from "use or occupancy of the leased premises."

Although the City retained the right to make reasonable inspections of "the demised premises," it specifically granted Metro the right to "have, hold and enjoy quiet and uninterrupted possession of the premises and rights herein leased and granted."

On May 16, 1977, the State filed a complaint against Metro, seeking payment of the 1975 real estate taxes for the property covered by the

agreement. The complaint alleged that Metro, as owner of the subject property, was liable for the real estate taxes thereon. Count I sought delinquent taxes of $3,878.39 plus interest and penalties for property identified as Permanent Index No. 12-08-100-006-8017, Volume 310. Count II sought delinquent taxes of $670.94 plus interest and penalties for property identified as Permanent Index No. 12-08-100-006-8082, Volume 310. The record does not establish which index number refers to the counter area and which refers to Temporary Service Area A.

The State subsequently moved for summary judgment. At the hearing on the motion the parties stipulated that the only issue in dispute was whether or not the "Airport Concession Agreement" constituted a lease. Metro apparently conceded that it would be liable for the taxes if found to be the lessee of the subject property. The trial court specifically found that "the agreement in question constitutes a lease," granted the motion for summary judgment, and awarded the State $5,915.13 plus costs. Metro appeals from the entry of that order.

OPINION

■■ Metro first contends that the agreement in question does not constitute a lease because it fails to pass an interest in certain property. We disagree. The essential requirements of a lease are: (1) a definite agreement as to the extent and bounds of the leased property; (2) a definite and agreed term; and (3) a definite and agreed price of rental and manner of payment. (*Weiman v. Butterman* (1970), 124 Ill. App. 2d 246, 260 N.E.2d 321; *Bournique v. Williams* (1922), 225 Ill. App. 12.) No particular words are required to create a lease. (*Miller v. Gordon* (1921), 296 Ill. 346, 129 N.E. 809.) Rather, the existence of a lease depends upon the intention of the parties and this intention must generally be inferred from the circumstances of the particular case. (*South Center Department Store v. South Parkway Building Corp.* (1958), 19 Ill. App. 2d 61, 153 N.E.2d 241.) Generally, however, the question of possession will determine the matter. *Holladay v. Chicago Arc Light & Power Co.* (1894), 55 Ill. App. 463.

■■ In the instant case Metro does not argue that the agreement fails to establish a definite and agreed term and price of rental. Rather, it argues only that the agreement fails to pass a possessory interest in specific property. However, the agreement clearly grants Metro exclusive possession of both Temporary Service Area A and the counter space in Terminal Buildings 2 and 3. Temporary Service Area A, consisting of exactly 52,027.40 square feet, is legally described and diagrammed in the agreement. Metro does not argue that this description is inadequate. The described counter space consisted of 248 square feet in Terminal Buildings 2 and 3. Although the exact location of the counter space would

be determined by the commissioner of aviation, the agreement clearly provided that the counter space be located on the "first floor concourse" of each building. The counter area could be relocated at the direction of the commissioner of aviation, but only upon 90 days written notice, only where necessitated by the modification or expansion of the Terminal Buildings, and only at the City's expense. Metro does not assert that the counter space was relocated during 1975, the relevant tax year. Both the service area and counter spaces were identifiable property. Furthermore, the agreement explicitly passed exclusive possession of the described premises rather than merely conferring a benefit upon Metro. This is evidenced by the following language:

"Throughout the term hereof, CONCESSIONAIRE [Metro] may have, hold and enjoy quiet and uninterrupted possession of the premises and rights herein leased and granted, subject to performance by CONCESSIONAIRE of its obligations herein and subject to any of the terms and conditions of this Agreement."

Metro next contends that the agreement is not a lease because it was entered into for the benefit of the City as well as for the benefit of Metro. However, a lease, by its very nature and purpose, confers benefits upon both the lessor and lessee. Accordingly, we find their contention to be without merit.

Metro finally contends that the agreement does not constitute a lease because it places various limitations upon the manner in which the premises may be used. The premises were to be used only for the operation of a rent-a-car service. Additionally, the agreement set certain standards and requirements pertaining to the operation of the service. It is clear, however, as Metro concedes, that an agreement does not fail as a lease simply because the premises may be used only for certain purposes. (*Gustin v. Barney* (1928), 250 Ill. App. 209.) In *Gustin*, the court upheld the existence of a lease even though the lessee was given the right only to hunt upon the premises while the lessor reserved all other uses.

In the instant case the limitations upon use and the restrictions imposed upon the operation of the business do not affect the existence of the lease. Other agreements and conditions may be, and often are, incorporated into a lease. *Miller v. Gordon* (1921), 296 Ill. 346, 129 N.E. 809.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.