METROPOLITAN AIRPORT AUTHORITY OF ROCK ISLAND COUNTY, ILLINOIS, d/b/a Quad City International Airport, Plaintiff-Appellant, v. THE PROPERTY TAX APPEAL BOARD *et al.*, Defendants-Appellees.

Third District   No. 3—98—0633

Opinion filed August 27, 1999.

Mary E. Garrels (argued), of Califf & Harper, P.C., of Moline, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Patrick W. Carlson (argued), Assistant Attorney General, of counsel), for appellee Illinois Property Tax Appeal Board.

Marshall E. Douglas, State's Attorney, of Rock Island (Cynthia J. Hennings, Assistant State's Attorney, of counsel), for appellee Rock Island County Board of Review.

PRESIDING JUSTICE HOLDRIDGE delivered the opinion of the court:

Plaintiff, Metropolitan Airport Authority of Rock Island (Authority), appeals from an order of the circuit court of Rock Island County affirming the administrative determination of the State of Illinois Property Tax Appeal Board (PTAB) denying the Authority's request for a reduction in the assessed valuation of four parcels owned by the airport. We affirm.

The four parcels of real estate in question in this appeal are owned by the Authority but are leased to four different car rental companies, Hertz, Budget, Avis and National. Each of the four parcels was assessed by the PTAB at a value of $39,433. The Authority maintains that these assessments were excessive because the assessments were based, not only upon the rent paid by the car rental companies, but also upon a concession fee paid by each company.

As the terms of the agreements between the Authority and the car

rental companies are crucial to an understanding of the issues in this matter, we will recite them in some detail. The record establishes that each car rental company signed an identical "Concession Agreement" with the Authority for the period beginning January 1, 1991, through December 31, 1995. Specifically, these agreements granted the four companies the "right to use and occupy in connection with the operation of [their] business, a car rental counter, consisting of 180 square feet to be located in the terminal building." The Authority furnished general maintenance, including heat, air conditioning and janitorial service. The agreements established a rental price for the counter space at $3,124.80 per year payable in monthly installments. In addition, the Authority agreed to furnish each rental company with at least 25 parking spaces at a rental fee of one dollar per space per month.

The Agreements further obligated each company to pay, "for the concession granted," an annual guarantee of the greater of either 10% of the gross receipts derived from the operation of business at the airport or a greater fixed guarantee. The agreements set a minimum guarantee for each car rental company as follows: Hertz was to pay $125,000 for 1991, $132,400 for 1992, $140,000 for 1993, $148,000 for 1994 and $156,000 for 1995; Budget was to pay $109,600 for 1991, $116,180 for 1992, $122,988 for 1993, $129,278 for 1994 and $135,716 for 1995; Avis was to pay $75,000 for 1991, $78,000 for 1992, $81,000 for 1993, $84,000 for 1994 and $87,000 for 1995; and National was to pay $92,004 for 1991, $93,996 for 1992, $96,000 for 1993, $98,004 for 1994 and $99,996 for 1995. Each company's monthly installment was calculated from these annual obligations, overpayments would be remitted after the end of each contract year, and the Authority could audit each company's records.

The agreements also provided certain termination provisions. The rental companies could, upon written notice, terminate their agreement upon any of certain enumerated occurrences; however, they could not assign or transfer their interest without the Authority's consent "except when such [was] the result of a merger, consolidation or reorganization." The Authority could terminate the agreements by giving 10 days' written notice if a company defaulted in payment or performance of any obligation or if the company made an assignment for the benefit of creditors or was adjudged bankrupt.

Finally, the agreements provided that the entire agreement would be considered by the parties to be a lease of real property and "all charges and payments of every nature to the Authority from [the car rental company] under this Agreement shall be considered rent."

This matter commenced when the Authority appealed the Rock

Island County Board of Review's 1995 assessment of the four subject parcels to the PTAB. Included in evidence presented at the hearing before the PTAB were written answers from the car rental companies to questionnaires regarding the management and control of their operations. The answers indicated that the companies' respective parent corporate entities all directed hours of operations, set employee work schedules, performance standards, dress codes, wages and salaries, and prices for vehicles and services. The parent corporate headquarters also made all decisions regarding hiring and firing of staff and maintained ownership of all equipment and supplies.

At the close of all evidence, the PTAB found that, based upon the lack of control over the rental companies' operations by the Authority, the relationship between the rental companies and the Authority was that of lessor/lessee, and the companies were not mere licensees.

The Authority filed a complaint in administrative review with the circuit court of Rock Island County, which affirmed the PTAB's decision. An appeal to this court ensued.

■ This court reviews decisions of the PTAB, not the decision of the circuit court. *Richard's Tire Co. v. Zehnder*, 295 Ill. App. 3d 48 (1998). The PTAB's findings and conclusions on questions of fact are *prima facie* true and correct and will not be disturbed unless they are contrary to the manifest weight of the evidence. 735 ILCS 5/3—110 (West 1996); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76 (1992). The PTAB's conclusions of law are subject to *de novo* review. *Kankakee County Board of Review v. Property Tax Appeal Board*, 131 Ill. 2d 1 (1989).

In the instant matter, the PTAB maintains that it correctly designated the Authority's "concession agreements" to be taxable leases, and not nontaxable licenses, because the agreements did not meet the legal characteristics of a license. For the following reasons, we agree.

■ Property belonging to an airport authority is exempt from property taxation (35 ILCS 200/15—160 (West 1996)), but such property loses that exemption when leased to a nonexempt entity. 35 ILCS 200/9—195 (West 1996); *People ex rel. Korzen v. American Airlines, Inc.*, 39 Ill. 2d 11 (1967). A leasehold interest in property is taxable at the rate of 33¹/₃% of its fair market value. 35 ILCS 200/9—145(b) (West 1996). Fair market value is synonymous with "fair cash value" (*Walsh v. Property Tax Appeal Board*, 181 Ill. 2d 228 (1998)), and fair cash value is defined as rental value in the market, which is the present value of what a willing lessee would pay a willing lessor for a right to use and occupy the premises for the remainder of the lease. *People ex rel. Rosewell v. Dee El Garage, Inc.*, 51 Ill. App. 3d 382 (1977).

■ While leases are taxable, licenses are not subject to taxation under the Property Tax Code (35 ILCS 200/1—1 *et seq.* (West 1996)). *Jackson Park Yacht Club v. Department of Local Government Affairs*, 93 Ill. App. 3d 542 (1981). A claimant has the burden of proof to show that a property is tax exempt, and any questionable matters must be resolved in favor of taxation. *Stevens v. Rosewell*, 170 Ill. App. 3d 58 (1988). Whether an agreement is a licence or a lease is not determined by the language used, but by the legal effect of the provisions and the intent of the parties. *Stevens*, 170 Ill. App. 3d at 62.

■ A lease is a contract, conveying a lesser interest in property than a deed, which gives possession of the leased premises for the full term of the lease. *In re Application of Olmstead*, 269 Ill. App. 3d 821 (1995). A lease requires "a definite agreement as to the extent and bounds of the property; a definite and agreed term; and a definite and agreed rental price and manner of payment." *Stevens*, 170 Ill. App. 3d at 62. Commercial leases routinely restrict the type of business for which the lessee may use the property. See *Fox v. Fox Valley Trotting Club*, 8 Ill. 2d 571, 572 (1956) (used solely "for the staging of harness races, at which pari-mutuel wagering is to occur, horse shows, rodeos, auctions and the like"); *Baird & Warner, Inc. v. Al-Par, Inc.*, 183 Ill. App. 3d 467 (1989) (use as a health and beauty aid store); *Simhawk Corp. v. Egler*, 52 Ill. App. 2d 449, 450-51 (1964) (use "only for the purpose of a shoe store engaged in the sale at retail of children's shoes and footwear").

■ In contrast, a license is a limited right to use the licensor's premises for a specific purpose, subject to the management and control retained by the licensor. *In re Application of Rosewell v. City of Chicago*, 69 Ill. App. 3d 996 (1979). A license conveys no right in the land and is revocable at the licensor's will. *Soderholm v. Chicago National League Ball Club, Inc.*, 225 Ill. App. 3d 119 (1992) (Chicago Cubs season ticket holder was entitled to enter ballpark only upon terms specified on tickets and possessed revocable license, not lease).

■ We find that the record and the applicable law support the findings and conclusions of the PTAB. In *People v. Chicago Metro Car Rentals, Inc.*, 72 Ill. App. 3d 626 (1979), a case strikingly similar to the one at bar, an "Airport Concession Agreement" between the City of Chicago and a rental car company which granted the company a "non-exclusive privilege *** to operate a rent-a-car business on, upon and from" O'Hare Airport and "for no other purpose whatsoever" was deemed a lease. *Chicago Metro*, 72 Ill. App. 3d at 627. Under the agreement, the city received 10% of the gross receipts as a "concession fee," with a minimum guarantee of $185,000 for the first year, as well as a set "rental" cost for the counter areas and car parking spaces.

As in *Chicago Metro*, in the instant matter the indicia of a leasehold are present. Other than restrictions on use of the premises only for the purpose of operating a car rental facility, the Authority retained no control over the premises. The evidence presented to the PTAB overwhelmingly established that the parent national corporate entities exercised management and control over the operations, not the Authority. As the Authority did not retain any significant control over the subject properties, the PTAB was correct in finding that the car companies' interests were those of lessees and not mere licensees.

We also note that the PTAB's determination is supported by the express terms of the agreements, which provide that all payments under the agreements are to be deemed as lease payments. While the Authority maintains that this provision is operative only in the event the car rental company were to file bankruptcy, we see no reason not to read this provision as a general statement of intent of the parties at the time the agreement was executed.

For the foregoing reasons, the order of the Property Tax Appeal Board is affirmed.

Affirmed.

KOEHLER and BRESLIN, JJ., concur.