2024 IL App (1st) 230132-U

No. 1-23-0132

Order filed August 23, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| 3850 W. CORTLAND, LLC, | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 M1 707215 |
| | ) | |
| AMYRIAD, INC., F/K/A AMYRIAD 707215 | ) | Honorable |
| D/B/A AMYRIAD MFG AND AMYRIAD | ) | Regina Mescall, |
| MANUFACTURING, | ) | Judge Presiding. |
| | ) | |
| Defendant-Appellant. | ) | |

---

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mitchell and Justice Lyle concurred in the judgment.

¶ 1    *Held:*   The trial court's finding that defendant violated the lease by improperly entering into subleases without the landlord's consent is against the manifest weight of the evidence; reversed and remanded.

**ORDER**

¶ 2    Defendant-Appellant, Amyriad, Inc., appeals from the trial court's December 20, 2022, judgment that found that it improperly entered into subleases for the subject property such that it violated the lease agreement it had with Plaintiff-Appellee, Chicago 3850, LLC, who was the

successor in interest to 3850 W. Cortland, LLC,[1] and therefore ordered possession of the property to plaintiff. Defendant also appeals the trial court's rulings entered on October 3, 2023, in which it issued a new eviction order, granted possession of the property to plaintiff, and ordered defendant to pay plaintiff use and occupancy payments.

¶ 3    On appeal, defendant contends that the court erred in its December 20, 2022, judgment when it ordered possession of the property to plaintiff and found that it violated the lease by entering into subleases with community workshop users. Defendant also contends that the court's October 3, 2023, orders violated its due process rights because plaintiff did not give proper notice of its motion to reinstate the eviction order, and the court erred when it ordered defendant to pay plaintiff use and occupancy payments during the time period when the property was in receivership from January 2023 to August 2023, and when it increased the monthly use and occupancy payments to $5,993, starting September 1, 2023. We reverse the trial court's December 20, 2022, judgment that found defendant violated the lease and ordered possession of the property to plaintiff. We therefore vacate the court's subsequent orders issued on October 3, 2023, and we remand to the trial court to determine the amount defendant owes plaintiff in rent payments.

¶ 4                                I. BACKGROUND

¶ 5    In 2008, defendant entered into a commercial lease agreement with Spoko Enterprises, LLC, for property located in the lower level basement unit of a building located at 3850 W. Cortland Avenue, in Chicago (property). In 2015, Spoko Enterprises sold all its interest in the property to its successor in interest, 3850 W. Cortland Avenue, LLC, which became defendant's landlord for the property.

---

[1] The notice of appeal refers to the plaintiff-appellee as "3850 W. Cortland, LLC." However, the trial court's orders refer to the plaintiff as "Chicago 3850, LLC." Defendant states in its brief that in 2019, 3850 W. Cortland, LLC, sold its interest in the property to Chicago 3850, LLC. We will refer to plaintiff-appellee as 3850 W. Cortland, LLC, or plaintiff.

¶ 6        In March 2020, plaintiff filed the operative third amended complaint. Plaintiff alleged that defendant violated the lease because it was subleasing part of the property without the landlord's consent and that defendant failed to pay all rent and electric charges. Plaintiff requested the court order defendant to pay amounts due under the lease as well as order possession of the property to plaintiff. Plaintiff attached the lease, which provided in paragraph four that, "[t]enant shall not sublease all or any part of the Leased Premises, or assign this Lease in whole or in part without Landlord's consent, such consent not to be unreasonably withheld or delayed." The lease also provided that "[t]enant may renew the lease for one or more extended term[s] of 1 year. The rental for any renewal lease term, if created as permitted under this Lease, shall be 5% rent escalation per each additional year."

¶ 7        Plaintiff also attached to its complaint, among other documents, a document dated April 26, 2018, and entitled "Landlord's Ten Day Notice to Quit Pursuant to 735 ILCS 5/9-210," which was signed by an agent of Chicago Property Investors, LLC, and addressed to defendant. It stated that "in consequence of your default for your failure to pay rent and electric charges and for unauthorized subletting pursuant to your lease *** Landlord has elected to terminate your lease."

¶ 8                         Motion for Summary judgment

¶ 9        In October 2022, defendant filed a motion for summary judgment, asserting, among other things, that the court should grant summary judgment on plaintiff's claim that defendant was improperly subleasing the property because the undisputed material facts showed that defendant never leased the property to anyone but rather provided a license to use the property. Defendant stated that it allowed woodworkers to use the professional woodworking equipment at the property and conferred a right to use its tools subject to its control. Defendant asserted that before a woodworker was allowed to use the equipment or access the property, the user had to sign a "Shop

Usage & Fee Agreement" whereby each person agreed to abide by a code of conduct and pay a monthly shop usage fee of $300 for 40 hours per week. Defendant stated that at all times it had exclusive possession or control of the property.

¶ 10     Following a hearing, the court denied in part and granted in part defendant's motion for summary judgment, finding that there was a material issue of fact regarding whether defendant improperly subleased the property. The trial court dismissed with prejudice all portions of the operative complaint seeking to terminate the lease for failure to pay electric charges and rent. In a written order, the court stated that "the only remaining issue relating to whether [p]laintiff may terminate the lease and seek possession is whether [d]efendant engaged in improper subleasing," and it set the matter for trial.

¶ 11                                December 2022 Trial

¶ 12     Initially, we note that the report of proceedings shows that the trial court admitted various exhibits at trial. The witnesses testified about the exhibits, but many of the exhibits are not included on the record on appeal. We note that some of the exhibits are included in the record because they were attached as exhibits to either defendant's motion for summary judgment or plaintiff's response to that motion.

¶ 13     Michael Goldstein testified that in 2015, 3850 W. Cortland purchased the property, and that Chicago 3850 LLC, of which he was a member, had a minority interest in the property. In 2019, 3850 W. Cortland sold its majority interest to and transferred the lease to Chicago 3850, LLC, which became the sole owner of the property. Goldstein testified that Chicago Property Investors, of which he is the manager and member, managed the property. Goldstein further testified that he never consented to a sublease or a partial sublease of the property. Before 3850 W. Cortland purchased the property from Spoko Enterprises in 2015, Goldstein inspected the

4

property to "see what they did." Asked whether the tenant estoppel certificate that he received at closing on the property put him on notice "that tenant had customers, employees and invitees at the premises?" he responded, "[c]ustomers, employees and—correct."

¶ 14    Goldstein, who had an office at the property, was there about three to five times each week. He testified that an individual named Jose Conception was a "subtenant," "acted as the manager," and was at the property "pretty much full-time every day." According to Goldstein, Conception made decisions on behalf of defendant. He identified various photographs of the property, including a photograph of Conception standing at a screen printing machine at the property. Goldstein testified that defendant's "subtenants roam the building" and that "[t]hey're operating their businesses inside Amyriad's premises, and they don't come and go, and they leave work there, they're operating as a business there, they're paying that landlord rent." He testified that there were "projects all over the space, not just one" and there were "many people operating their businesses there." Asked whether he had knowledge regarding if "any of these alleged subtenants have the right to exclusive possession and control of the premises," he responded, "[a]s far as I'm concerned, they're strangers to me. So, I don't know how they would have exclusive control of my building, my premises."

¶ 15    Goldstein testified about an email he received on August 22, 2016, from defendant's "former subtenant," which inquired about a workspace at the property and stated that he had "rented from [Harry Barnett] years back." Harry Barnett was the president of defendant Amyriad. Goldstein testified about and identified advertisements that defendant posted on Craigslist. One advertisement showed photographs of the property along with "his machinery, his rents" and another showed defendant "advertising space for sublease in its premises," with pictures of the premises and "all his machinery." He also identified two photographs he took of a wall outside

Barnett's office inside the property and testified that they showed about 20 of the same keys on a key ring as well as an "agreement to a sublease to other tenants along with other information that looks like it's for other tenants to use."

¶ 16       Eloisa Agosto testified that her father, Jose Conception, used to run his global silk screen and pad printing business from the property. Her father and Barnett "shared the basement" and rented the space together. She testified that "[w]hen they decided to rent that place together and build, he took one portion of the side and [Barnett] took one of the other side." Her father had been at the space for about 10 years. When Barnett was not there, her father "basically took care of the in and out, the payments, the keys." She also testified that Barnett "did everything when it came down to the people." Her father had a dedicated portion in the property to operate his silk screen and pad printing business, and he had exclusive possession and control of that portion of the property. Defendant did not have control over her father's business.

¶ 17       Agosto testified that the property was open 24 hours each day, with no restrictions on the dates or times her father could work. She testified that she would see people come in and out from the "wood side" of the shop, they had to walk through her father's business to get to the other side, and "everyone that had keys came in and out from that portion of my dad's business." She would see other people store in designated areas the materials and projects that they were working on. Asked whether she could tell these people to leave the premises where her dad was working, she responded that, "[t]hey never used my dad's premises side. They would just come in, I can't tell nobody to leave if they were authorized by [Barnett] telling my dad, okay, give him the key." Asked whether Barnett "exerted control over how you used the property and telling you had to keep it clean and those sorts of issues, is that correct?" she responded, "[c]orrect, yes." She testified that her father did not operate his business at the property anymore because defendant "just tossed

6

us out" without giving her a reason. She testified that they did not have a lease or agreement and that it "was just your rent is due, pay this, pay that, and that was it, don't send it through check."

¶ 18    Iris Ayala, Goldstein's assistant manager, testified that she collected rent and monitored the property, which included monitoring the 24 security cameras. She testified that she would often see cars parked in the basement outside of defendant's space and testified that "if the shop was full they would go out to the common area and be working on their *** project that they were working on" and that "the majority of the times, a lot of them were working on their cars, too."

¶ 19    Leonard Clark testified that in 2017 and 2018, he paid defendant for about five to six months to use the property. In 2018, he used the property for one month to refinish tables for his employer at that time, Hot Wok Cool Sushi, which paid Barnett. Clark was not given exclusive possession or control of any part of the property.

¶ 20    Harry Barnett, the president of Amyriad, testified that Amyriad, which was a community woodshop, entered into a lease with Spoko Enterprises in 2008, and that it had always been solely responsible for the rent payments. Since 2015, defendant had renewed the lease according to the renewal requirements set forth in the lease. Barnett had an office in the property, with a desk, shelves, and a private bathroom to which only he had a key. The property had 3 table saws, 5 chop saws, and 10 benches "[i]n case there's more than one or two people that want to use it, there's still room for people." He stated that it was "[j]ust like a gym, they have 20 workout bicycles." He testified that people were "not there for the space," they were "there for the tools," and there were "about 30 different tools, equipment, whatever you want to refer to them as." Barnett assigned each user a "shelf for their raw materials" and there were "multiple areas for their projects in process." Each user received a locker for their tools. Defendant did not provide the locks, but it had the ability to cut them off.

¶ 21 Barnett further testified that a user was not able to exercise any control over another user, and during orientation, he told the users that "nothing you do should impact someone else and nothing they do should impact you." A user could not leave their stuff on a bench for more than a couple of days, as the benches had to be free for anyone to start working at any time. Barnett once told a user referred to as "Ziggy" to remove a wardrobe cabinet that he was not working on, and when he did not remove it, Barnett removed the cabinet. Barnett testified that "the shop is not there for endless storage" and "[i]t's for projects in process." A user did not have the ability to tell anyone else to leave and they had to contact Barnett if there was an issue. Defendant also offered woodworking and machinery safety classes at the property. Barnett testified that he "maintain[ed] control of the entire premises 24/7," and when he was not there, he used his security cameras to monitor the property.

¶ 22 Barnett further testified that defendant never entered into a sublease with any user for the property nor accepted any rental payments, and it never transferred exclusive possession or control of the shop to any user. No user was an employee or agent of defendant. He testified that he drafted a "shop user and fee agreement" and "full and final mutual release" for the space and wanted to make sure they were "taken after elements of a gym membership and, like, a pottery class, things that you may go to once or multiple times" and "that it would not be a lease, it was just *** an agreement to use the space." Barnett testified that under the shop user and fee agreement, only the individual who signed it could use the shop, and each user could access the shop 24 hours a day, 7 days each week, under certain conditions. The doors had electronic locks, and if a user did not follow the rules and regulations, Barnett could remove their code for the lock and eject them from the space. Under the shop user and fee agreement, the users were required to do their own clean up, and he charged a $15 minimum fee if they did not do it.

¶ 23      Barnett also testified that the amount of time each user agreed to use the space was different from person to person, and he had people who used the space for one day if they wanted to use a specific machine. Defendant allowed users to use the shop for free, including one who used it for two or three days to build a cart to deliver Girl Scout cookies and a group of high school students who used it for a science project. He testified that he probably had other examples of people who used the space for free "in the spirt of it being a community shared space woodshop."

¶ 24      Barnett identified Craigslist's advertisements that he had posted for the space and testified that the advertisements were for "shared space" and showed everything defendant owned in the shop. He testified that one posting showed an advertisement for a wood shop, cabinet shop for $150 per month and that it stated, "big shop space available to share." Another Craigslist posting stated that the shop could be used for 15 hours a week for $150 a month and up to 40 hours per week for $300 per month. If a user exceeded 40 hours per week, they had to limit the hours the following week. He testified that "if someone is using the shop too much, then there isn't enough space for the other users" and he monitored the user's time through an "honor system" and security cameras. Barnett did not have control over the users' businesses, but he controlled the users coming into the shop.

¶ 25      Barnett acknowledged that the word "rent" was included in the shop usage and fee agreement in the provision stating that a user's materials will be returned to them "provided that their rent is paid for the month." He testified that "the reason that word rent is in there is because I copy and pasted multiple other documents, like, from gym memberships, et cetera, and that word made it in there" but that it "clearly at the top states, it's a shop user and fee agreement." Barnett identified a check issued to defendant from Hot Woks Cool Sushi for $350 on March 8, 2018, with the memo line stating that it was for "rental of shop."

¶ 26 We note that Edgard Velez, who worked for Chicago Property Investors and did maintenance at the property, as well Goldstein, Ayala, and Clark all provided testimony on the notices for improper subleasing addressed to defendant.

¶ 27 Trial Court's Ruling

¶ 28 The trial court found that plaintiff met its burden of proving that defendant was subleasing the property in violation of the lease, as it did not receive consent, and the court ordered possession of the property to plaintiff. In doing so, the court noted that the case "hinges" on exclusive control. It stated that it could consider the Craigslist's advertisements as circumstantial evidence regarding whether the elements of a lease existed as well as to determine Barnett's intent. It noted that the advertisements included the "extent and bounds of the property" and "an explanation regarding the terms of the lease." The court stated that the advertisements showed the square footage and "the amount of rent as we know that full time would be, I believe, it was $300 for 40 hours a week *** but 40 would be considered full time and the time and manner of payment."

¶ 29 The court stated that there were numerous photographs showing people in the property, including Conception next to a silk screening press, and it identified Clark, Conception, and Ziggy as different subtenants. The court stated that "there can be different leases for different portions of the property." The court noted that Goldstein had testified that Conception asked him for 30 keys and that Agosto testified that her father had exclusive control, rented the property with Barnett, "ran everything," and that Barnett "had nothing to do with" her father's silk-screening business. The court also stated:

> "What is glaring *** is that at all times, Mr. Barnett would have the right to kick out the licensee, you're not following the rules, you're acting a fool in the shop, you're acting

unsafe in the shop, I can kick you out at any time. And if you don't pay, I can even withhold some of your materials."

The court ordered defendant to pay a total of $15,972.70 for use and occupancy for the time period of February 2022 to December 2022, with a $500 fine per day if defendant failed to comply. The court also issued a written eviction order, which ordered possession of the property to plaintiff.

¶ 30                                   December 2022 to October 2023

¶ 31       On January 17, 2023, defendant filed a timely notice of appeal in this court, requesting review of the trial court's December 20, 2022, judgment. On September 11, 2023, plaintiff filed a motion to dismiss the appeal in this court, stating that defendant never requested a stay of the proceedings in the trial court and that it had filed in the trial court a motion to reinstate the eviction order, which was pending in the trial court.

¶ 32                               Motion to Reinstate the Eviction Order

¶ 33       On August 23, 2023, plaintiff filed in the trial court a "motion to reinstate eviction order for payment of use and occupancy for a finding of civil contempt,"[2] in which it requested the court to reinstate the eviction order, or enter a new eviction order, as it had been more than 120 days since the court entered the December 20, 2022, eviction order. Plaintiff also requested the court enter an order compelling defendant to pay use and occupancy payments in the amount of $5,993 per month for the period of January 1, 2023, through July 31, 2023, and it attached an affidavit in support of its claim. The affidavit is not included in the record on appeal.

¶ 34       At the October 3, 2023, hearing on plaintiff's motion to reinstate the eviction order, plaintiff explained that after the court entered its original eviction order, the property went into

_____

[2] Plaintiff's motion to reinstate the eviction order is not included in the record on appeal, but plaintiff included a copy of the motion in the appendix to its brief. The parties do not dispute the authenticity of the document that was stamped as filed by the circuit court of Cook County, and we may take judicial notice of public records. See *Bayview Loan Servicing, LLC v. Starks*, 2022 IL App (2d) 210056, ¶ 14.

receivership, but that the receiver had been discharged. Plaintiff argued that defendant occupied the premises and was required to pay for use and occupancy.

¶ 35　　　In response, defendant argued, among other things, that the court should deny the motion because plaintiff failed to comply with the statutory notice requirements for eviction orders that are older than 120 days. Defendant also argued that the receivership order prohibited plaintiff from recovering rent during the receivership period. Defendant asserted that the court should strike plaintiff's affidavit it filed to support the amount it was requesting in use and occupancy payments because the amount was based on a third-party evaluation that was not attached to the affidavit.

¶ 36　　　Following the hearing, the court issued a new eviction order and concluded that plaintiff was entitled to use and occupancy payments during the receivership period, noting that the receiver was discharged on September 13, 2023, and that "the landlord is still entitled to rent during this period." The court therefore ordered defendant to pay use and occupancy payments in the amount of $12,728, for the time period of January 1, 2023, to August 31, 2023. As for the monthly use and occupancy payments after the receivership period, which started September 1, 2023, the court stated that the appraisal attached to plaintiff's affidavit was "not just a frivolous number" and "dictate[d] this matter." It ordered defendant to pay $5,993 per month in use and occupancy payments starting September 1, 2023.

¶ 37　　　In a written order, the court stated that the "eviction is granted by a separate order of court" and it ordered defendant to pay use and occupancy payments for the amounts set forth above. The court also entered an eviction order on October 3, 2023, in which it ordered possession of the property to plaintiff. [3]

_____

[3] The trial court's orders entered on October 3, 2023, are not included in the record on appeal, but the parties included copies of these orders in the appendices to their briefs. The parties do not dispute the authenticity of these orders, and we may take judicial notice of public records. See *Bayview Loan Servicing, LLC*, 2022 IL App (2d) 210056, ¶ 14.

¶ 38    On October 20, 2023, defendant filed an amended notice of appeal, requesting review of the trial court's October 3, 2023, judgment. This appeal follows.

¶ 39                                    II. ANALYSIS

¶ 40    On appeal, defendant contends that the trial court erred in its December 20, 2022, order, when it found that defendant violated the lease by entering into sublease agreements for its community workshop space without plaintiff, the landlord's, consent. Defendant asserts that the evidence showed that the shop users were licensees and that it maintained exclusive possession and control of the community workshop.

¶ 41    "Whether a contractual agreement is a lease or a license is determined, not from the language used, but from the legal effect of its provisions." *Jackson Park Yacht Club v. Illinois Department of Local Government Affairs*, 93 Ill. App. 3d 542, 546 (1981). "A lease provides a lessee with exclusive possession of the leased premises." *Leonardi v. Chicago Transit Authority*, 341 Ill. App. 3d 1038, 1043 (2003). "To qualify as a lease contract, 'there must be an agreement as to the extent and bounds of the property, the rental price and time and manner of payment, and the term of the lease.' " *Id.* (quoting *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.,* 114 Ill. 2d 133, 145 (1986)); see also *Metropolitan Airport Authority of Rock Island County v. State Property Tax Appeal Board*, 307 Ill. App. 3d 52, 56 (1999). "If any of these elements are missing, a lease has not been created; but the fact that an agreement may contain all of these essential requirements for a lease does not necessarily make it a lease." *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 310 (2010).

¶ 42    Further, the "distinguishing characteristic of a lease is the surrender of possession and control of the property to the tenant for the agreed upon term." *Id.* at 309. "In contrast, an agreement which merely entitles a party to use the premises for a specific purpose, subject to the

management and control retained by the owner, does not constitute a lease, but rather, grants only a license." *Chemical Petroleum Exchange, Inc. v. Metropolitan. Sanitary District of Greater Chicago*, 81 Ill. App. 3d 1005, 1009-10 (1980). Our supreme court has explained that a license is distinguished from a lease as follows:

" '[A] license generally provides the licensee with less rights in real estate than a lease. If the contract gives exclusive possession of the premises against all the world, including the owner, it is a lease, but if it merely confers a privilege to occupy the premises under the owner, it is a license.' " *Millennium Park Joint Venture*, 241 Ill. 2d at 309 (quoting 53 C.J.S. *Licenses* § 133, at 608 (2005)).

¶ 43        Further, a license "is essentially permission to do an act or a series of acts upon the land of another without possessing any estate or interest in such land." *Id*. "Thus, the principal difference between a lease and a license is that a lease confers the right to exclusively possess and control property, whereas a license merely confers a right to use property for a specific purpose, subject to the licensor's control." *Id.* "Although some divestiture of control is inherent in any granting of a license, it is the degree of possession and control that must be considered to determine whether a lease rather than a license has been granted." *Id.* Further, a "license is not assignable" (*Jackson Park Yacht Club*, 93 Ill. App. 3d at 547) and is "revocable at the licensor's will." *Metropolitan Airport Authority of Rock Island County*, 307 Ill. App. 3d at 56.

¶ 44        Generally, the interpretation of a lease is a question of law that a reviewing court reviews *de novo*. *NutraSweet Co. v. American National Bank & Trust Co. of Chicago*, 262 Ill. App. 3d 688, 694 (1994). However, here, we are not interpreting the provision in the lease between plaintiff and defendant regarding subleasing the property. Rather, we are reviewing the trial court's factual finding that defendant improperly entered into subleases for the property without the

landlord's consent in violation of the lease. When a party challenges a judgment entered in a bench trial, as here, "we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence." *Gonzales v. Second Federal Savings & Loan Ass'n*, 2011 IL App (1st) 102297, ¶ 45. A judgment is considered against the manifest weight of the evidence "only if the opposite conclusion is apparent or if the finding appears to be arbitrary, unreasonable, or not based on the evidence." *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 14.

¶ 45    Initially, as previously noted, "[a] lease requires 'a definite agreement as to the extent and bounds of the property; a definite and agreed term; and a definite and agreed rental price and manner of payment.' " *Metropolitan Airport Authority of Rock Island County*, 307 Ill. App. 3d at 56 (quoting *Stevens v. Rosewell,* 170 Ill. App. 3d 58, 62 (1988)). In finding that defendant entered into subleases with the users, the trial court relied in part on the Craigslist's advertisements for the space, as it stated that it could look to them to determine whether the elements of a lease existed and that they showed the "extent and bounds of the property," "an explanation regarding the terms of the lease," the square footage, and "the amount of rent as we know that full time would be, I believe, it was $300 for 40 hours a week *** but 40 would be considered full time and the time and manner of payment." However, the Craigslist's advertisements for the space do not constitute agreements that contain definite lease terms between the users and defendant that could constitute a sublease agreement.

¶ 46    Further, the evidence does not show that defendant had a definite agreement regarding the extent and bounds of the property, the term, rental price, or manner of payment with any of the users, which is required for a lease. See *id.* Agosto testified that she and her father did not have a lease or agreement with defendant and that it "was just your rent is due, pay this, pay that, and that

was it" and that defendant "just tossed us out" without giving her a reason, providing support that her father did not have a definite lease term or agreement containing the elements of lease with defendant. Clark's testimony also shows that he did not have an agreement with defendant that contained the essential elements of a lease such as a definite agreed term, as he testified that he paid defendant a monthly fee for about five to six months in 2017 and 2018 and that if he used the space for more than one month on a personal project, Barnett told him "that it was time to give him another check for the following month." He also testified that he used the space for one month to refinish tables for his employer, who rented the space and paid Barnett for that month. Further, Barnett testified that he allowed some users to use the space for one day and others to use it for free "in the spirt of it being a community shared space woodshop." Accordingly, the evidence does not show that defendant and any of the users entered into agreements that contained the essential requirements of a lease.

¶ 47    Next, applying the principles set forth above regarding the characteristics of licenses and subleases, from our review of the evidence, the trial court's finding that defendant entered into subleases with the users for the space is against the manifest weight of the evidence. As previously noted, the main "difference between a lease and a license is that a lease confers the right to exclusively possess and control property, whereas a license merely confers a right to use property for a specific purpose, subject to the licensor's control." *Millennium Park Joint Venture, LLC*, 241 Ill. 2d at 309. Here, the evidence shows that defendant retained exclusive possession and control of the premises and that it merely gave the users the right to use and occupy the premises for a specific purpose of using the tools and equipment there subject to its management and control.

¶ 48    Barnett testified about the control defendant maintained over the space that he described as a "community workshop" that people used for the tools and equipment there, which

16

included 10 benches and multiple saws. Barnett testified that the users could not leave their belongings on a bench for more than a couple of days, explaining that the benches had to be free for anyone to start working at any time. Barnett could cut a user's lock off of the locker in which their tools were stored, he could remove their code from the electronic door locks and eject them if they did not follow the rules and regulations, and he controlled who came into the shop. Barnett also testified that he had removed a user's cabinet from the space, as "the shop is not there for endless storage" and "[i]t's for projects in process." Barnett also maintained control over the user's time in the space, which he monitored though a security system. Although the shop was open 24 hours each day, if a user exceeded 40 hours in one week, they had to limit their time the following week. He also required the users to clean up after themselves, and if they did not do so, he charged a fee. Given the extent of control that defendant retained over the premises, the users lacked the exclusive possession that is necessary for a sublease. See *Chemical Petroleum Exchange, Inc.*, 81 Ill. App. 3d at 1010 (finding that, "[i]n view of the extent of control retained by plaintiff, [the third party] lacked the exclusive possession essential to the character of a sublease").

¶ 49 Further, the evidence shows that defendant never transferred exclusive possession and control of the premises to any of the users, and the users shared the space subject to Barnett's control. Clark testified that he was not given exclusive possession or control over any part of the property. Barnett testified that the Craigslist's advertisements were for "shared space" and a user was not able to exercise control over any other users. He also testified that he told them at orientation that "nothing you do should impact someone else and nothing they do should impact you" and that a user could not leave their materials on a bench for more than a couple of days, as the benches had to be free for anyone to start working. See *Millennium Park Joint Venture*, 241 Ill. 2d at 310-11 (where the court found plaintiff's agreement with the Park District created a

17

license, it noted that "[t]he agreement does not permit the exclusive use of the concession area by plaintiff, and plaintiff shares the concession area with other users"). Although Agosto testified that her father had a dedicated portion in the property to operate his silk screen and pad printing business and that he had exclusive possession and control over that portion of the property, she also testified that she could not tell anyone to leave if Barnett authorized them, that Barnett exerted control by telling them that they had to keep the space clean, and that defendant "tossed" her father's business out without giving a reason. We also note that "some divestiture of control is inherent in any granting of a license," and "it is the degree of possession and control that must be considered to determine whether a lease rather than a license has been granted." *Id.* at 309. Based on the degree of control defendant retained as discussed above, we cannot find that Agosto's testimony supports a conclusion that defendant transferred the right to exclusively possess and control the space, or any portion of the space, to her, her father, or any other user such that defendant had a sublease with any of them.

¶ 50     In addition, the evidence shows that the agreement the users had with defendant for the space was revocable and not assignable, providing further support that defendant granted the users licenses, not subleases, to use and occupy the space. See *Metropolitan Airport Authority of Rock Island County*, 307 Ill. App. 3d at 56 ("A license conveys no right in the land and is revocable at the licensor's will"). As previously discussed, Agosto testified that defendant "tossed" her father's business out and no longer allowed him to use the space without giving a reason, and Barnett testified he could remove the users' access to the electronic door locks and eject them from the space if they did not follow the rules and regulations. Barnett also removed a user's wardrobe cabinet from the space when the user did not comply with his request to move the item. Further, Barnett testified that under the "shop user and fee agreement," only the individual who signed the

18

agreement could use the shop such that the use of the space was not assignable. See *Jackson Park Yacht Club*, 93 Ill. App. 3d at 547 (where the court found that the permit agreements were revocable licenses, it noted that they were revocable and not assignable without written consent).

¶ 51    Accordingly, the evidence shows that defendant maintained exclusive possession and control over the premises, and that it only conferred a privilege to the users to occupy the premises for a specific purpose. The evidence therefore shows that the agreements defendant had with the users for the space were license agreements, not subleases. The trial court's finding that defendant entered into subleases for the space is not based on the evidence. We therefore reverse the trial court's December 20, 2022, judgment that found that defendant violated the lease by improperly entering into sublease agreements without the landlord's consent and ordered possession of the property to plaintiff.

¶ 52    We note that defendant contends that plaintiff's 10-day notice to quit was insufficient because plaintiff did not serve defendant's agent, and the notice did not comply with the terms of the lease. Given our disposition, we need not address these arguments.

¶ 53                    Trial Court's October 3, 2023, Orders

¶ 54    Defendant contends that the trial court erred when it entered its October 3, 2023, orders that "granted" the eviction and ordered possession of the property to plaintiff because plaintiff failed to comply with the notice requirements for reinstating an eviction order that is older than 120 days set forth in section 9-117 of the Eviction Act (735 ILCS 5/9-117 (West 2022)). This section provides that "[n]o eviction order obtained in an action brought under this Article may be enforced more than 120 days after the order is entered, unless upon motion by the plaintiff the court grants an extension of the period of enforcement of the order." This section also sets forth the language that shall be contained in the notice of the motion directed to the defendant. *Id.*

¶ 55 Following the October 3, 2023, hearing on plaintiff's motion to reinstate the eviction order, the trial court issued a new eviction order and "granted" the eviction. Because we are reversing the trial court's December 20, 2022, judgment, which found that defendant violated the lease for improperly subleasing the property and ordered possession of the property to plaintiff, we vacate the trial court's October 3, 2023, orders. We therefore need not address defendant's argument that plaintiff did not comply with the statutory requirements for reinstating an eviction order that is older than 120 days.

¶ 56 Defendant also argues that the court erred when it increased the use and occupancy amount from $1,591 per month to $5,993 per month starting September 1, 2023.

¶ 57 Under section 9-201 of the Eviction Act, a party who brings a forcible entry and detainer action may "recover use and occupancy charges pending resolution of the possession claim." *Circle Management, LLC v. Olivier*, 378 Ill. App. 3d 601, 608 (2007) (citing 735 ILCS 5/9-201 (West 2004)). Under this section, a court may award use and occupancy " '[w]hen lands are held and occupied by any person without any special agreement for rent.' " *People ex rel. Department of Transportation v. Cook Development Co.*, 274 Ill. App. 3d 175, 179 (1995) (quoting 735 ILCS 5/9-201(2) (West 1992)). The Eviction Act authorizes use and occupancy payments "because '[a] lessee's obligation to pay rent continues as a matter of law, even though the lessee may ultimately establish a right to rescind the lease, vacate the premises, or obtain other relief.' " *Circle Management, LLC*, 378 Ill. App. 3d at 609 (quoting *Cook Development*, 274 Ill. App. 3d at 180).

¶ 58 Here, we have already concluded that the court erred in its December 20, 2022, judgment when it found that defendant violated the lease by improperly entering into subleases without the landlord's consent and ordered possession of the property to plaintiff. As previously

20

stated, we, therefore, vacate the court's October 3, 2023, orders that "granted" the eviction and ordered possession of the property to plaintiff. At the time the court entered the December 20, 2022, judgment, there was a valid lease agreement, and defendant had an obligation to pay rent pursuant to the terms of the lease agreement. We therefore remand this case to the trial court to hold a hearing to determine the amount that defendant owes plaintiff in rent pursuant to the terms of the lease agreement.

¶ 59　　　We note that defendant also argues that the court erred in its October 3, 2023, ruling when it ordered defendant to pay plaintiff a total of $12,728 in use and occupancy payments during the receivership period from January 1, 2023, to August 31, 2023. Defendant asserts that the order conflicted with the chancery's court order appointing the receiver and the Illinois Mortgage Foreclosure Law.

¶ 60　　　Initially, we note that the order appointing a receiver for the property is not in the record on appeal. In the appendix to defendant's brief, it included a copy of the chancery court's order appointing a receiver to manage the property. The parties do not dispute the contents of this order, and we may take judicial notice of public records. See *Koshinski v. Trame*, 2017 IL App (5th) 150398, ¶ 10 (taking judicial notice of circuit court's orders, noting that "[a] reviewing court may take judicial notice of readily verifiable facts if doing so will aid in efficiently disposing of the case, even if the parties did not seek judicial notice in the trial court").

¶ 61　　　Paragraph four of the order appointing the receiver provides that the receiver "may demand and collect from the tenants in possession *** all rents, income, receivables and other amounts now due and unpaid and all rents, income, receivables and other amounts thereafter to become due." Paragraph 21 of the order provides that the "Borrower and its agents, representatives and employees are enjoined from *** collecting or attempting to collect the rents or other income."

¶ 62      Further, under the Illinois Mortgage Foreclosure Law (IMFL), a receiver has the power to "collect the rents, issues and profits from the mortgaged real estate" 735 ILCS 5/15-1704(b)(2) (West 2022). A receiver also has the duty to "accept all rental payments from an occupant of the mortgaged property." 735 ILCS 5/15-1704(c)(2.5) (West 2022).

¶ 63      Accordingly, under the order appointing the receiver and the IMFL, the receiver may collect rent from the tenant, here defendant, and under the order appointing the receiver, the borrower, here plaintiff, is "enjoined from *** collecting or attempting to collect the rents or other income." The record is not clear on the status of defendant's rental payments during the receivership period. At the October 3, 2023, hearing, defense counsel told the court that it was his understanding that defendant tendered rent to the receiver, but he was not sure if the receiver accepted it. Defendant asserts in its brief on appeal that "[w]hile the property was in receivership, Amyriad sent monthly use and occupancy payments, but the Receiver returned the payments." Further, the receiver was not at the October 3, 2023, hearing, and the record is also not clear on whether the court had a copy of the chancery court's January 17, 2023, order appointing the receiver when it ordered defendant to pay plaintiff $12,728 in use and occupancy during the receivership period. Therefore, at the hearing on remand, the trial court must also determine the amount, if any, defendant owes plaintiff in past due rent for the time period during which the receiver managed the property.

¶ 64      Lastly, while this appeal was pending, we issued an order granting defendant's emergency motion to stay the eviction. Thereafter, plaintiff filed a motion to vacate the order staying the eviction, which we took with the case. Given our disposition, plaintiff's motion to vacate the order staying the eviction is denied as moot.

¶ 65                                III. CONCLUSION

22

¶ 66    The trial court erred in its December 20, 2022, judgment that found that defendant was improperly subleasing the property in violation of the lease and ordered possession of the property to plaintiff. Because the court erred in its December 20, 2022, judgment, we vacate its October 3, 2023, orders, in which it issued a new eviction order and ordered defendant to pay use and occupancy payments. We reverse and remand to the trial court for the court to determine the amount defendant owes plaintiff in rent pursuant to the terms of the lease.

¶ 67    Reversed; vacated and remanded.